ALLEGRE'S ADM'RS vs. THE MARYLAND INSURANCE COMPANY.—*June*, 1830.

Orders for, and contracts of insurance are to be liberally construed, and with reference not only to the situation and circumstances of the subject matter of insurance, but also of the parties by whom the insurance is effected.

So an application for insurance from *Rio de la Plata* to *Havana*, which stated " said vessel will sail from *La Plata* in the course of *this* month," made by a merchant in *Baltimore*, to an insurance company there, is not to be regarded as a technical representation of the time of the vessel's departure, but as a statement merely of the belief, or opinion of the applicant, that she would sail at the time mentioned.

In an action on a policy of insurance, the question, whether the risk has been materially increased by the sailing of the vessel on her voyage, at one time, instead of another, ought not to be submitted to the jury, when no testimony whatever had been adduced on the subject, to warrant the jury in drawing such a conclusion.

It is competent to offer evidence, whether, according to the custom and usage of insurance companies, the word cargo, in an order for insurance, would be considered as covering live stock.

A policy on cargo, or goods and merchandize, will not cover articles which are stowed upon deck.

The word cargo, in an order for insurance, does not, ordinarily, cover live stock; but if live stock constitute the only article of exportation from the port from which the vessel carrying the insured property is to sail, to the port to which she is destined; or if, according to the mercantile usage of the place of effecting the insurance, the word cargo is understood to cover live stock, then an insurance under that general denomination, will cover live stock.

The existence of such usage, when evidence is offered for and against it, is a question exclusively for the jury.

Uniformity of decision among the several States of the Union, on questions connected with contracts of insurance, is. of vast importance to the mercantile community; and that consideration alone, in the absence of all motive or obligation to embrace a contrary doctrine, should induce the sanction of principles established in the other States.

APPEAL from *Baltimore* County Court.

This was an action of *Covenant* on a policy of insurance. It is the same case which was before the Court of Appeals at June Term, 1825, when the then judgment was reversed, and the record remitted to the Court below, with a writ of *procedendo.* 6 *Harr. and Johns.* 408. The death of the plaintiff below was suggested, and his administrators, (the now appellants,) made plaintiffs, &c.

1. At the new trial the plaintiffs offered in evidence the policy of insurance upon which this action was brought, entered into by the defendants, (the appellees) on the 23d of May, 1820. The sum subscribed to be insured, was $6000. The policy stated, that "whereas *J. B. A. Allegre,* for the concerned, doth make insurance, and cause himself to be insured, lost or not lost, at and from *Rio de la Plata* to *Havana,* with liberty of *Martinico,* upon all kinds of lawful goods and merchandizes, laden, or to be laden, on board the good brig called the *Eugene,* whereof ———— is master for this present voyage, or whosoever else should go for master in the said vessel. Beginning the adventure upon the said lawful goods and merchandizes, from and immediately following the loading thereof on board of said vessel, at *Rio de la Plata* aforesaid, and so shall continue and endure, until the said goods and merchandizes shall be safely landed at ———— aforesaid, &c." The policy was in the usual form, the assured having paid after the rate of 5 per cent. for the assurance. There was a clause, that in case of loss, such loss to be paid in 90 days after proof, &c. And if any dispute should arise relating to a loss, it should be referred to two persons, &c. The second article of the memorandum at the foot of the policy, is, "if the above vessel, after a regular survey, shall be condemned for being unsound or rotten, the company shall not be bound to pay their subscription to this policy." The plaintiffs also gave in evidence, that the brig *Eugene* sailed from *Monte Video,* on the river *La Plata,* on the 12th of July, 1820, for *Havana,* laden with 106 mules, and 4 jack asses, belonging

to *Charles A. Chalumeau*, for whom the said insurance was effected; that the said brig was in all respects seaworthy; and that in the progress of her said voyage, she encountered tempestuous weather, by which she was much damaged, and the mules and jack asses all killed, except 10 mules; that the said brig was compelled, by the damage aforesaid, and the violence of the winds and waves, to put into *Rio de Janeiro*, where she was duly and regularly surveyed, and ascertained to be unworthy of being repaired, and thereupon sold; and that the said remaining 10 mules were also thereupon sold; and further proved, that the insured thereupon duly abandoned the cargo aforesaid to the defendants. The plaintiffs also read in evidence by consent, the protest, and other documents. The protest was made and sworn to by the master, mate, and two of the seamen of the brig *Eugene*, before the Vice Consul of the *United States of America*, for the port of *Rio de Janeiro*, on the 19th of August, 1820, detailing minutely all the particulars of the shipment of the cargo on board the vessel, her sailing on the voyage, and the loss sustained. At the same time, before the said Vice Consul, the master called for regular surveys, by good and capable men, &c. Then follows a bill of lading, dated the 8th July, 1820, signed by the master of the brig *Eugene*, and by whom was shipped from *Monte Video*, and bound to *Havana*, 106 mules and 4 jack asses. Also an account of the sale of the brig *Eugene*, condemned, as unworthy of repairs. Also an account of sales of the cargo of the said brig. The plaintiffs further read in evidence sundry depositions of witnesses, taken and returned under a commission issued for that purpose from *Baltimore County Court*, to certain persons, named as commissioners, at *Rio de Janeiro;* but as the questions decided by the Court below do not seem to depend upon the testimony taken under the commission, which was as to the condition of the vessel on her arrival at *Rio de Janeiro*, and the injury she had sustained, and as to the survey made of the vessel, and whether she could not have been repaired, &c. it is omitted.

The defendants then read in evidence, by consent, the invoice of the cargo put on board the vessel, and an account of the charges and expenses incurred with the mules and asses, bought as a cargo for the brig *Eugene*, on account of Capt. *C. A. Chalumeau*, viz: 107 mules and 4 asses, which, with the expenses, &c. amounted to $795 50; which cargo remained on board on account of the above mentioned captain. Signed, *Monte Video*, the 3d June, 1820. The defendants also offered in evidence the following order for insurance, whereon the said policy was founded. "Baltimore, 23d May, 1820. Gentlemen,—Insurance is wanted for account of the concerned, at and from *Rio de la Plata* to *Havana*, with liberty of *Martinico*, on the cargo of the brig *Eugene*, *Charles A. Chalumeau*, master, valued at $6000. Said brig will sail from *La Plata* in the course of this month. What will be the premium?, *J. B. A .Allegre.*" "5 p. c." "*Agreed, J. B. A. Allegre.*"

The defendants then prayed the court to direct the jury, that misrepresentation in a material fact, whether from fraud, mistake, or negligence, equally vitiates the contract, whether it be that of the insured, or his agents; that every representation respecting the time of the sailing of the ship is in law material; that the representation to the *Maryland Insurance Company* is positive that the ship will sail in May; and the plaintiff's intestate, having himself shown, that she did not sail till the 12th of July following; if the jury shall be of opinion that the danger of the voyage was increased by that circumstance in any degree, however small, and that the disclosure of that circumstance to the defendants was of a nature to have influenced their judgment in any degree, however small, either in taking, or declining the risk, or in enhancing the premium to however small an amount, this misrepresentation was a material one, which avoids the contract of insurance, and the plaintiffs are not entitled to recover on that policy; and the law is the same, although this misrepresentation on the part of the plaintiff's intestate might have been innocently made by

him, in ignorance of the true state of the facts, that then the plaintiffs are not entitled to recover. Which opinion and direction the Court, [HANSON, A. J.] refused to give, unless the risk was materially increased by the vessel not sailing at the time represented; and with this qualification, gave the direction prayed for. The plaintiffs and defendants both excepted.

2. The defendants then called a witness, who stated that he was a merchant of long standing, and had been a member of some one of the insurance offices in *Baltimore* from their first establishment; and asked him whether, according to the usage and custom of insurance companies, the above order for insurance would be considered as covering live stock? To which question the plaintiffs objected. But the court overruled such objection, and permitted the question to be asked. The plaintiffs excepted.

3. The plaintiffs then offered in evidence, that mules and jack asses, in 1820, and for many years before, were a common article of commerce and export from the river *La Plata*. That they were, during the times aforesaid, the chief articles of commerce between the river *La Plata* and *Martinico;* and that there was a trade in mules in 1820, from *La Plata* to the *West Indies* generally. The witness stated, that he knew nothing of the commerce in mules between *La Plata* and *Havana* particularly, except from his personal knowledge, which is confined to the following cases: He was at the river *La Plata* in March, 1820, and saw a vessel sail from that river loaded with mules, and saw her afterwards arrive at *Havana*—it was the *British* brig *Palmyra*. He believes her tonnage to be about 220 to 230 tons. She sailed with 170 to 180 mules, and arrived with only 33 alive, 4 or 5 of which died after she arrived. He saw another vessel, an *American* vessel, sail from the river *La Plata* with 180 or 190 mules, bound for *Havana*. The witness understood her destination from her captain. The witness understood that he afterwards put into *Charleston* in distress, and never arrived at *Havana*. The mules on

board the *Palmyra* were stowed in two rows on the upper and lower decks. *Enseanado*, on the river *La Plata*, is the principal port for exporting mules. All mules from *Buenos Ayres* are embarked at *Enseanado*. More vessels, while the witness was at *Enseanado*, loaded with jerked beef and tallow, than mules; but the vessels for the *West Indies* loaded principally with mules. The witness was at *Enseanado* and *Buenos Ayres*, from March to July, 1820. The plaintiffs also offered in evidence, by another witness, that he was in the river *La Plata* in 1822, and that he understood that there was a trade in mules from the river *La Plata* to the *West Indies* generally, and principally to the Windward Islands; but has no knowledge of such a trade to *Havana* particularly. He, himself, carried a cargo of jerked beef from *Monte Video* to *Havana*. He knows of no instance of a cargo of mules from the river *La Plata* to *Havana*. But there might have been vessels loaded at *Enseanado*, about 18 miles below *Buenos Ayres*, which is the principal mule port on the river *La Plata*. The witness was not at *Enseanado*. They also offered in evidence, that mules sold in *Martinico* at $120, and that mules from the *Maine* sold at *Jamaica* at from $75 to $160—averaging $130, previously to the introduction of steam mills. That the mules from the *Maine* are much smaller than those from the river *La Plata*.

The defendants then offered to prove, by the testimony of *William Patterson*, who had been engaged in trade and commerce as a merchant in the city of *Baltimore*, and also as a director in one of the insurance companies established there, that a general policy on cargo does not embrace a cargo of live stock, or animals, according to the mercantile understanding and interpretation of such a policy in the city of *Baltimore*, and that when live stock or animals are meant to be insured, they are always insured by name, and that a much higher premium is asked than for an ordinary cargo of merchandize. The insurers consider a cargo of live stock more dangerous than an ordinary dead cargo, and

would charge a higher premium for the former, than the latter. And upon looking at the order for insurance in the present case, he said that he would not consider it as an application to insure live stock or mules; and he believes it would be the general mercantile understanding of the construction of such order, that it did not embrace a cargo of live animals. They also offered to prove by *Daniel Howland*, another witness, who had been president of an insurance company, and a director for more than twenty years, and a commander of a vessel for many years previous, that there is a difference between ordinary cargoes and those of live stock or mules, in the price of transportation, and that the latter are considered the most dangerous. The insurers would make a difference in the premium they would ask, for the insuring the one or the other of such cargoes. He also proved, that in his own opinion the order in this case would be considered, as intended only to cover ordinary cargoes, and not live stock or animals; and that he believed such would be the understanding and usage of underwriters, and others engaged in insurance, of the sense and meaning of the terms used in the said order. They further offered to prove by *David Winchester*, another witness, who had been a president and director of an insurance company in *Baltimore* upwards of 25 years, that the order of insurance in this case would not, in the judgment of underwriters, and others engaged in effecting insurances, be considered as covering a cargo of live stock or mules. That the words therein used, have acquired an appropriate sense between insurer and assured, by which they are understood to apply to a cargo not attended with any extraordinary perils, and are not understood to apply to live stock or mules ; and that the premium which would be asked for insuring a cargo of mules would be higher, than for insuring an ordinary dead or inanimate cargo. They also offered to prove by *Hugh Birckhead*, a director of one of the insurance companies in *Baltimore*, that the order for insurance in this case, according to the general understanding among insurers, and others,

in *Baltimore*, would not be considered as an offer to insure mules and jack asses; that the difference between a cargo of live stock and dead goods is so great, that he should consider it the duty of the insured to state the fact that live stock was intended to be covered, in order to put the insurer and insured on an equal footing; and that the difference of premium on the insurance of those two kinds of cargo was considerable. They also offered to prove by *Henry Thompson*, long a director in an insurance company in *Baltimore*, and extensively engaged in commerce, that live stock is always considered by underwriters as a more dangerous cargo than dead goods; and the premium of insurance is much higher for insuring live stock, than dead cargo; and that such an order would not, in his opinion, be considered as an order for live stock. That according to the usage of merchants and insurers, the danger of a vessel, in the transportation of mules and live stock, is greater than that of a vessel employed in carrying a cargo of dead goods; and that the premium would be enhanced on a vessel carrying mules and jack asses; which fact the defendants also proved by the testimony of the said *Daniel Howland*, *David Winchester*, and *William Patterson*.

The plaintiffs then offered in evidence, by competent witnesses, long acquainted with insurance business, and with the usages of trade and mercantile understanding in matters of commerce, that there was no usage of trade or mercantile understanding which excluded mules and jack asses from the general term of cargo, used in an order for insurance, or otherwise; and that there was no usage of trade or general mercantile understanding in *Baltimore*, or general understanding among the insurers in *Baltimore*, by which live stock, or mules and jack asses, would not be considered as covered by a general insurance on cargo. They also offered in evidence, that the term cargo in the aforesaid order for insurance, would, according to the mercantile understanding and usage of trade, among the insurers and merchants of *Baltimore*, be considered as covering

mules and jack asses. They further offered in evidence, that a cargo of mules and jack asses is not a more hazardous cargo for insurance than any common cargo; and that a cargo of mules does not increase the risk of the vessel.

The plaintiffs then prayed the court to direct the jury—1st. That if the jury find from the evidence that in the year 1820, and for some years before, mules and jack asses were well known articles of exportation from *Rio de la Plata*, and that cargoes of them were about that time usually exported, and had been for some years before, usually exported from that river, then the omission of the said *Allegre* to state to the underwriters, before, or at the time of making the said insurance, that the said cargo was to be a cargo of mules and jack asses, is not such a concealment as will vitiate the policy, on which this suit is brought; unless the jury shall find from the evidence, that according to the known and established usage of trade in the city of *Baltimore*, the order in question was construed and understood not to comprehend mules and jack asses in the cargo therein mentioned. 2d. If the jury find from the evidence, that mules and jack asses, in the year 1820, and for several years before, were usual articles of exportation from *Rio de la Plata* to *Martinico*, then the omission of the said *Allegre* to represent to the underwriters that the cargo, mentioned in the said order for insurance, was a cargo of mules and jack asses, is not such a concealment as will vitiate the said policy; unless the jury find from the evidence, that according to mercantile usage and understanding in the city of *Baltimore*, the word cargo in the said order did not comprehend mules and jack asses. Which directions, and each of them, the court [HANSON, A. J.] refused to give; but gave the following opinion and direction to the jury : An usage of trade must be definite, uniform, certain, sufficiently long established, and so generally known, as to warrant the conclusion that the parties contracted in reference to it. This is necessary, in order to be obligatory on either party. First—There is no usage

proved that the word cargo necessarily, in mercantile understanding, either excludes live stock, or that it includes it; nor of an usage that a greater premium would be charged on an insurance on mules, than on a dead cargo. Secondly. There is no evidence of an usage in trade of mules from the river *La Plata* to *Havana.* There is evidence that the only trade from *La Plata* to *Martinique* is in live stock; and if the voyage insured was from that river to *Martinique,* and no further, the policy would be good— the underwriters being bound to know the trade as one of an established usage. But the *terminus* of the voyage was the *Havana;* and no usage of trade in mules to that place from the river *La Plata* being proved, the underwriters were not bound to know it, from the circumstance of liberty to *Martinique* being stipulated in the policy, and consequently, not bound to inquire about the specific nature of the cargo. The insured, therefore, was guilty of a concealment fatal to the policy, provided the jury believe, that the risk was materially increased by the cargo being of mules, instead of a dead cargo. We say materially, because if all of a cargo was a dead one, yet from the different qualities of articles of commerce, one commodity must be, in some degree, always more hazardous than another. A cargo of buoyant articles would not abstract the attention of the crew in a storm from the navigation of the vessel, whereas the necessity of throwing over a heavy cargo, for the purpose of lightening the vessel, might; but such a slight difference in the risk would not vitiate the policy; because contracts of insurance, being contracts of indemnity, are to be construed liberally, in order to get at the true equitable intentions of the parties, and are not to be settled according to the very letter of the contract, and rendered void because the cargo shipped was different from the one appearing on the face of the policy, technically construed, provided all things were done in good faith, and the situation of the parties not essentially changed, by a cargo being mules, instead of a dead cargo, even if no usage of such trade

existed; unless the risk was thereby materially increased; and this is the only question open to the jury, which they must decide from the evidence they have heard at the bar. The plaintiffs excepted; and the verdict and judgment being against them, they appealed to the Court of Appeals.

The cause was argued before BUCHANAN, Ch. J., ARCHER, and DORSEY, J.

*Mayer*, for the appellants, contended upon the *first* exception, that the order does not contain a positive representation in law, that the vessel would sail in May, but must be understood by the Court, as expressing only a calculation or belief, that the vessel would then sail. Upon the *second* exception he contended, 1. That the evidence of a usage of insurance companies, being but of a particular portion of the commercial community, was inadmissible.   2. That evidence of such a usage, even of the mercantile community at large, would have been inadmissible. Upon the *third* exception, he said, 1st. The words " cargo, and *lawful goods and merchandize*," legally comprehended the mules and jack asses, if proved to be articles of commerce.   2. That there was evidence of their being articles of common export and commerce from *Rio de la Plata;* and that the underwriters were bound to know they might be embraced by the word " *cargo*," in the order, and must be considered as embraced in the words of the policy, "*lawful goods and merchandize.*"   3. That the vessel having, by the words "*liberty of Martinico*," the right of trading at *Martinico*, and there being evidence of mules being the only articles of trade from the river *La Plata* to that island, the insurance covers the cargo in question, although not specifically made known to the underwriters by the assured.   4. That the opinion and direction of the Court, under the *third* exception, is, in other respects, erroneous.   1. There was no representation, either in a real or technical sense, that the vessel would sail in May.   As the agent of the assured

and the underwriters stood, the agent could not be understood as stipulating that the vessel would sail in May; he did not say he would warrant her doing so. A party may be so situated, that his language cannot be understood in a literal sense. *Hubbell vs. Glover*, 3 *Campb.* 313. *Bowden vs. Vaughan*, 10 *East.* 415. *Bryan vs. Featherstone*, 4 *Taunt.* 869. *Barber vs. Fletcher*, *Doug.* 306. A representation is never looked upon as a part of the policy, and does not affect it, except in cases of fraud. The insured need not prove the truth of all his representations; the underwriter must show that he has been deceived. *Philips on Insurance*, 84. 2. It is right that the contracts of parties should be affected by the usage of trade, because it applies to both, but that is not like suffering insurance companies to interpret their own contracts. 2 *Stark. Ev.* 448, 449, 450, 451. 3. It was sufficient for us to show that goods and merchandize include all articles of trade, and that mules and jack asses are articles of trade. The question is not as to the variance of the risk, because if that was material, then the least variance would be as fatal as the greatest. The prayer in the *third* exception, was on the ground that there was evidence of the usage of trade, and as there was evidence, it was for the jury to say whether the usage we contend for was proved. The usage attempted to be proved was, that mules and jack asses are included in the term cargo. The sense of terms may be enlarged in policies of insurance. 1 *Marshall*, 474, 475, 93, 323. *Philips on Insurance*, 66, 89. The only circumstances which the assured are bound to disclose, are those which may be supposed to be in his peculiar knowledge. When the offer for insurance is ambiguous, the underwriter is bound to ask an explanation; and if he does not, the construction most against him shall be adopted. *Livingston and Gilchrist vs. Maryland Insurance Company*, 7 *Cranch*, 535. *McLanahan vs. The Universal Insurance Company* 1 *Peters S. C. R.* 187. There can be no concealment except as to a collateral fact. *Philips on Insurance*, 80. *Boyd vs.*

*Dubois,* 3 *Campb.* 133. It is not necessary to give information as to political events, or whether the articles are contraband of war. *Skidmore vs. Desdoity,* 2 *Johns. Cas.* 77. *Duguet vs. Rhinelander, Ib.* 476. *Seton and Co. vs. Low,* 1 *Johns. Cas.* 1. *Richardson et al. vs. Maine Insurance Company,* 6 *Mass. Rep.* 102. *Philips,* 89, 90, 102, 108. There is in this policy a memorandum of excepted articles, and therefore no other article is presumed to be excepted to. Insurance for whom it may concern, will cover all interests. *Buck and Hedrick vs. Chesapeake Insurance Company,* 1 *Peters S. C. R.* 151.

*Meredith,* for the appellee. The first question is, whether the representation in this case is such as to be binding on the parties; its materiality has been decided by the jury. A representation is the affirmation or denial of a fact. *Philips,* 84. The order for insurance says, that the brig will sail from *La Plata* in the month of May. There is a distinction as to the representations made by the owner of the goods, and the owner of the ship. *Hubbard vs. Glover,* 3 *Campb.* 312. Representations which must be founded on expectation or calculation are not binding, but parties are held to the truth of positive statements. *Dennistown et al. vs. Lillie and al.* 3 *Bligh's P. R.* 202. A representation and a warranty differ in this, that the former does not affect the contract, unless it be of a material fact; but a warranty, if false, destroys the contract. The case of *Bryan vs. Featherstone,* 4 *Taunt.* 869, was merely the expression of an opinion. There are two prayers in the 3d exception; the difference between them is, that in the one, the course of trade from *La Plata,* generally, is relied on; and in the other, from *La Plata* to *Martinico.* Does the legal signification of the word "*cargo,*" include live animals? If it does not, can the course of trade be resorted to, to control the legal sense of the term?

It is admitted, that as a general rule, it is not necessary to describe the cargo, but live animals are the subjects of a

special insurance. *Bottomry* and *Respondentia* interests, are not included in the term cargo. *Glover vs. Black*, 3 *Burr.* 1394. 1 *Marsh*, 318. There are many articles properly termed goods, which are not comprehended under the general terms goods, wares, and merchandize, in the policy. *Brough and Wetmore*, 4 *Term Rep.* 206. 1 *Marsh*, 320. Articles clearly included in the term goods, are not covered by the policy, if exposed from their situation, to peculiar perils. 1 *Marsh*, 320. *Lenox vs. United Ins. Co.* 3 *Johns. Cas.* 178. 1 *Caines*, 44. Those articles which from their nature are subject to detriment or diminution in value, are not to be considered as insured against, unless the insurer knows of them. 3 *Kent's Com.* 247. *French Com. Code*, 213. A cargo of living animals must, necessarily, be in more danger than a dead cargo. *Woolcot, et al. vs. Eagle Insurance Company*, 4 *Pick Rep.* 429. In all the cases in the English books, insurance upon living animals was always effected, *eo nomine*. Is an underwriter to be presumed to enter into his contract with reference to the course of trade? According to the signification of the term cargo, the property in this case would be excluded; it could not here have been the intention of the party to insure a cargo of this description.

The policy was an open one for $6000, and the first cost of the mules, &c. was less than $600. You are not to look at the value of the cargo at the place of destination, but to the selling price at the place of shipment, in an open policy. 3 *Kent's Com.* 221. *Carson and Smith vs. Marine Ins. Co.* 2 *Wash. Cir. Court Rep.* 468. Asking for insurance for $6000, is evidence that no such cargo was contemplated, because, instead of one, it would load 16 or 17 vessels. Is there any evidence of a course of trade which can extend the meaning of the term cargo?

The proof is, that according to the usage in *Baltimore* among underwriters, the word cargo does not include living animals, and the contract in this case was between a *Baltimore* office, and the plaintiff's agent, living in *Baltimore*.

Evidence that mules, &c. with other articles, were exported generally from *La Plata,* cannot affect a particular policy of insurance. In this case but two instances are proved of shipments of such articles from *La Plata* to *Havana,* and these cannot establish a usage. 1 *Marsh,* 186. A liberty to touch, does not justify trading at all events, if delay is created. *United States vs. Paul Shearman,* 1 *Peters Cir. Court Rep.* 98. It is not material what was the course of trade from the river *La Plata* to *Martinico,* the intermediate port, because the course of trade, between the port of departure and the intermediate port, is never looked to. No usage of trade has been proved in this case, which can be binding: to be binding, the usage must be exclusive, definite, uniform, and well known. *Philips,* 18, 16. 1 *Marshall,* 186, 320. *Park,* 303, 304, 305. *Parker and others vs. Jones,* 13 *Mass. Rep.* 173. The trade in mules and jack asses, not being exclusive, could not have been in the contemplation of the underwriters. The Court below said no usage was proved to include or exclude this cargo. Where Courts have put a construction on the terms of a contract, no evidence of usage giving a different construction can be received; but no such construction as has been contended for has been put by the Courts.

*Wirt,* also for appellee. We insist on two propositions. 1. If there is in the record any thing which is fatal to the plaintiff's recovery, errors by the Court below, in other respects, will not induce this Court to order a *procedendo.* *Turnpike Co. vs. Barnes,* 6 *Harr. and Johns.* 61. 2. The appellant cannot take advantage of errors, unless they be to his prejudice. The question in the *first* exception is as to the effect of the representation. The prayer of the defendant is, that there was a representation as to the time of sailing, and the Court say, that if the variance between the actual sailing of the vessel, and the time mentioned in the

offer for insurance, materially increased the risk, then it avoided the policy.

The appellant contends, that this was not a representation; but every positive statement as to the time of sailing, is a material representation. 1 *Marshall*, 463. And every material representation, either by the assured or his agent, which is not true, destroys the policy. 1 *Marshall*, 457. We admit that the statement of the time of sailing, must be positive, and not expressed as mere matter of belief, but we insist in this case, that the statement was positive, and is therefore binding. 1 *Marshall*, 454. If the broker or agent make the statement as matter of belief, or expectation, the underwriter is bound to inquire, but not when the statement is positive. It is contended here, however, that although the terms used were positive, (and that is admitted) yet as the condition of the party was such that he could not know certainly the truth of his statement, he must be considered as merely affirming his belief. We have a right to suppose that the statement made by the agent was made by the authority of *Chalumeau*, the principal, who was the master of the ship. It is immaterial whether the party making the statement knows the fact or not; if it be a material fact, and he undertake to speak positively, he is answerable for its truth. 1 *Marshall*, 456. And it is the same whether the representation is made by agent or principal. 1 *Marshall*, 457. *Fitzherbert vs. Mather*, 1 *Term Rep.* 12. If it be true, that the statement of the time of a ship's sailing, (being abroad) is to be considered as the representation of belief, then it follows that a ship abroad cannot be insured at all. In *Doug.* 247, *Lord Mansfield* speaks of the importance of accuracy in regard to a ship's sailing. In reference to the position that a representation of this character is to be treated as the expression of an opinion, he referred to 3 *Bligh's Par. Rep.* 202. 3 *Campb.* 312, 313, cited on the other side, was a statement, not as to time of sailing, but the representation there, was as to the risks being a summer or winter risk. The positive statement

152     CASES IN THE COURT OF APPEALS

Allegre's Adm'rs *vs.* The Maryland Insurance Company.—1830.

which was not true, was, that a cargo was ready. The Court in that case say, that the time of sailing was the only fact which the party could be presumed to know. The fact that a cargo is ready, is not a fact which the party is bound to know, but he is bound to know whether the ship has sailed or not. The case of *Bowden vs. Vaughan,* 10 *East.* 415, was the case of a representation made by the owner of the goods, who had no control over the sailing of the ship.

In the case before the Court, the representation was made by both the owner of the goods, and master of the ship, and therefore is binding. *Park,* 284. The case in *Bligh* seems to condemn the decision in 10 *East,* 415, because in *Bligh* the policy was on ship and cargo, and the house of lords might, if they had approved of the case in *East,* have decided the policy to be good as respected the owner of the goods, who had no control over the ship, and bad as regarded the ship owner.

The case in 4 *Taunton,* 869, was a representation made to a subsequent underwriter, and there was nothing said as to the time the ship would sail, nor positively where she was; it was merely said that she was in one of three situations. In *Barber vs. Fletcher, Douglass,* 306, the word *expected* is used. The jury in this case having decided the representation to be material, there is an insuperable bar to the recovery of the plaintiff, should it be sent back. Parol proof may be resorted to, to explain technical terms used among merchants, unless an interpretation has been assigned them by the Courts. 2 *Stark.* 455. *Allegre vs. The Maryland Insurance Company,* 6 *Harr. and Johns.* 410, 411. Suppose it could be shown that among insurance companies the word cargo is never understood as including living animals; could not proof be admitted to prove the understanding? It is objected, however, that the evidence was admitted to restrain the ordinary import of the term cargo, which it is said cannot be done, though proof would be admissible to enlarge it. But is this position true? the

proof went neither to enlarge nor limit the sense of the term, but simply to give it its technical meaning; and this may be done. 1 *Phillips' Ev.* 490. *Phil. on Ins.* 18. The only difference between the plaintiff's two prayers in this exception is, that in the first, the termination of the voyage is not, and in the second it is, given.

The question of usage, is a question of law, and for the Court. 2 *Stark. Ev.* 452. The usage must be reasonable, and is to be decided by the Court, as in respect to notice of protest of bills of exchange. But the instruction that there was no usage, was advantageous to the appellants, and therefore they cannot object to it. The plaintiff did not put his prayer upon the ground that there was, or was not an usage, but that there was a trade in such animals from *La Plata*, and this the Court did not deny. The Court said there must be a material increase of risk to require a disclosure, and in this they were right. It is not important that every part of the opinion should be sound, if the general result is right: if the word cargo, does not include live stock, then the judge was right; if it does, he was wrong, and his judgment must be reversed. Does the word include live stock? goods lashed upon the deck are cargo, yet they are excluded from the policy, because they are exposed to an increased risk. Unless specified, they are excluded upon that ground, and this shows that the universality of the meaning of the word cargo, contended for, cannot be maintained. No case can be found in which the word cargo has been decided to include dead and living animals. *Marshall*, 93, cited on the other side, merely says, that slaves were formerly insured as merchandize: he gives no case, professes to give none, nor does he say what information must be given to the underwriter, nor what sort of an order was required. The authorities show, that live stock must always be insured, specifically and *nominatim*. *Woolcot, et al. vs. Eagle Insurance Company,* 4 *Pick.* 433. The distinction is not between different descriptions of dead cargo, but between dead and living cargo,

and this case demonstrates the importance of the distinction. The condition of the animals in the storm, and the attention necessarily given them by the crew, shows how much more danger there is in a cargo of this sort.    This is a new question, and therefore you may look to the reason of the thing: is it not most reasonable that parties should be bound to disclose the nature of the cargo, when it is one of this description?   From *Enseanado*, there is a trade exclusively in mules, and here the party was careful not to speak of that port, but spoke of the *La Plata*, where there is a mixed trade.   As there is a trade in other things from *La Plata*, will the Court exclude living animals?   The *termini* of the voyage is always in the contemplation of the underwriter; and as between the *La Plata* and the *Havana* there is no such trade in living animals, as could induce him to look to a cargo of this description.

*Taney*, (Attorney General) in reply.

The first question is, was the representation in the offer for insurance, a statement of a fact, or merely the expression of an opinion.   There is no evidence of improper motives on the part of *Allegre*.   We contend, that it was no representation of a fact, according to the insurance law, but simply the statement of an expectation.   The letter from *Allegre* to the office, is dated May 23d, 1820, and says the brig will sail in the course of the month.   The underwriters could not have believed that *Allegre* had any pointed information on the subject.   You do not, in construing a representation, always understand parties according to the literal meaning of the terms employed; you must look to their situation; the means of information they possess, and the subject matter about which they are speaking: and these things considered, *Allegre* could only be understood as stating an expectation.   Was the insurance office misled? for if it was not, then there is an end of the question.   He was speaking of a future event, and not a past one.   When a party speaks of an event of which he may, or may not

have knowledge, then, whether he state a fact, or express an opinion, will depend on the terms employed. Not so in regard to a fact of which he cannot have knowledge. 1 *Marshall,* 444, 455. For the definition of a representation, he referred to *Livingston and Gilchrist vs. Maryland Ins. Co.* 7 *Cranch,* 536. When a party speaks of a future event, he necessarily speaks of a *belief,* founded on facts, and cannot be understood as *asserting a fact.* In the case in *Blye,* the letter to the underwriter was written on the 18th of June, and stated that the vessel was to sail on the 1st of May; the letter, therefore, was written 49 days after the sailing was to have taken place. The argument in 3 *Blye,* 208, puts it on the ground that she was a missing ship. It was not a representation that she would sail on a given day, but that she should be kept in port until the day. She did not sail after, but before, the day mentioned. It was in the power of the party to keep the vessel in port as long as he pleased, and therefore is not like a representation that she is to sail on a particular day. Over the one event he has a control, but not over the other; saying that she was in port on the 1st of May, was representing her then to be in safety; if she had not sailed until the 1st of May, the 49 days would not have elapsed, and she would not have been a missing ship. Whether the time be material or not, is a fact for the jury. *McLanahan vs. The Universal Ins. Co.* 1 *Peters S. C. R.* 187, 188, 189. The case in 3 *Campbell,* 312, was an insurance on the ship, and therefore the distinction between the owner of the vessel and cargo, does not apply to this case. The assertion in that case was, that a cargo was ready, and it was equally as positive as the statement in this case, yet the Court say it was merely the statement of an opinion. In *Rice and others vs. The New England Insurance Company,* 4 *Pick.* 439, the letter of the agent stated, that he expected the vessel to sail on a particular day, and it was charged and proved, that he did not truly represent the facts upon which his expectation was bottomed. By his statement to the underwriters, he induced

them to believe the vessel was in time, which the agent had reason to think was not the case. In *Whitney and al. vs. Havener*, 13 *Mass. Rep.* 172, the representation was, that the vessel would sail in five days from the date of the policy; yet the Court say it is not binding. The day of sailing is seldom material, and if the underwriter thinks so, why does he not ask for a warranty, as in most other cases. If the vessel sail *before* the time, it may be material, because then, as in the case in *Bligh,* she may be a missing ship at the time the insurance is effected, but her sailing after, cannot have that effect. It cannot be inferred, from the record, that the jury found the representation in this case to be material, as is said on the other side. Two questions were left to the jury, and the Court cannot know which they found for the defendant; both were material, and if either was found for defendant, the verdict must be in his favor. In 6 *Harr. and Johns.* 410, the judgment was affirmed; if the judgment is reversed, the party under the Act of Assembly, is entitled to a *procedendo, ex debito justicia.* In the 2d exception, the question is, not upon the admissibility of evidence of usage; but the point is upon the question asked. The question in 6 *Harr. and Johns.* 410, was not whether usage could be proved, but whether the proper kind of proof was offered. Usages may be proved by acts, but not by opinions. The attempt to prove the usage here, was by the opinions of witnesses. Usages which are not matters of law, cannot be established by the opinions of witnesses. 2 *Stark. Ev.* 449, 452, 453. The usage of the underwriters, unless generally known, or known to the agent of the assured, is not binding. *McGregor vs. Insurance Company of Pennsylvania,* 1 *Wash. Cir. Court Rep.* 39. *Cox's Dig.* 385, *pla.* 159. In the case of *Raborg vs. The Bank of Columbia,* 1 *Harr. and Gill,* 231, and the other cases, the usage was proved by acts, and not by opinions.

Did the omission to disclose that the cargo was of living animals, vitiate the policy? What is the policy? and what

was the situation of the assured and the underwriter? *Chalumeau*, the owner and captain, was in *La Plata*, and when he requested his agent in *Baltimore* to effect insurance for him, might not have known what sort of cargo he would ship. He might have intended to purchase other articles; how then could he insure, except by the word cargo. He could not make a special insurance, because he knew not what articles he should buy. If the agent had insured mules, or other property, specifically, and he had shipped other articles, he would have lost his insurance. The underwriters were bound to know the articles of trade in the river *La Plata*, and to regulate their premium accordingly. The use of the general term "cargo," was notice to them. Mules and asses are exported from *La Plata* to the *Havana*, the port of destination, and particularly to *Martinico*, one of the points named. To say that a man in such circumstances shall specify his cargo, is to say he shall not insure at all, or to compel him to make up his mind as to what he shall ship, before he wishes to do so: such was the situation of the parties. Now let us look at the policy. The point of destination is left blank, for the very purpose of giving to the party a discretion to go to *Martinico*, or the *Havana*. From *La Plata* to *Martinico*, the great subjects of commerce are mules and jack asses: we say the term cargo embraces such subjects. If they are embraced, it is incumbent on the other side to show a usage, excluding them. They attempted to prove it, and failed, there being proof on both sides: if there is any usage restraining the meaning of the word, they ought to have shown it. That the word cargo includes living animals, see 1 *Marshall*, 93, note (*a*) *Martin vs. Delaware Insurance Company*, 2 *Wash. Cir. Court Rep.* 255. We admit that *respondentia* and *bottomry* interests are not insured as cargo, because they are not in fact cargo. They are not laden on board the ship. 3 *Kent's Com.* 247. The first answer to the decisions, that goods lashed on deck are not covered by

the policy is, that the property in this case was not lashed on deck; and the second is, that goods so exposed, are not excluded from the policy, upon the ground that they are not cargo, but because in that situation, they are liable to unusual perils. They must show that goods on deck are not cargo, and that the mules, &c. were on deck, before those decisions will apply. In 11 *Petersdorff*, 377, the goods were on deck, notwithstanding which they were considered cargo, and covered by the policy. A party is not bound to state the condition of his goods, and of course not their character. *Boyd vs. Dubois*, 3 *Camp.* 133. The question then is, if mules are cargo, was it the duty of the party to disclose it. The case in 4 *Pick.* 429, relied on by the appellee, was decided without the authority of a single *American* or *English* case. Although certainly respectable, it is not authority *eo nomine*. The reasoning of the Court is the additional peril. Can this Court base its opinion on such a ground? It would be undoing all that has been done up to the present time. In *Buck and Hedrick vs. The Chesapeake Insurance Company*, 1 *Peters' S. C. Rep.* 151, the insurance was for whom it might concern; and there the policy was made to cover belligerent property, because the Court say the use of those words was an awakening circumstance: so here, the word "cargo" ought to have put the underwriter on his guard. The decision in 2 *Johns. Cas.* 77, shows that the difference of risk is unimportant, whether it proceeds from danger of capture, or any other cause. The principle of the decision in 4 *Pick.* 429, cannot, therefore, be the true one. In 3 *Camp.* 133, damaged hay was put on board, which was liable to effervesce; yet the Court said the assured was not bound to disclose the fact. The answer to the case in 13 *Mass. Rep.* 173, cited on the other side, for the position that we should have proved an exclusive trade in mules, is, that the word "cargo" includes the property, and the other party should have shown an usage, excepting them. The error of the Court below, was in confounding the usage of trading in

particular articles, with the laws regulating commerce. If the Court are right in saying there must be a long and uniform usage, then there can be no policy on new articles of trade. What would have become of the first policies on gunpowder, fruit, and other perishable articles. We consider the policy a valued one, for $6000. It is the amount named in it; and there is no principle which says that parties may not put what value they please on the cargo. *Phil. on Ins.* 310.

DORSEY, J. delivered the opinion of the Court.

The first exception presents the question, does that part of the order for insurance, which speaks of the time of the sailing of the *Eugene*, amount to a representation? The inquiry is simply this; is *Allegre* to be understood as asserting a fact or expressing an expectation or belief, founded on facts of which he had knowledge? Give to this order a literal interpretation, and it may well be regarded as the assurance or statement of the fact, that the brig would sail some time during the month of May. But instruments or contracts of this kind are to be liberally construed, and with reference not only to the situation and circumstances of the subject matter of insurance, but also of the parties by whom the insurance is effected. There is nothing in the proof, presented by the record in this cause, to shew that the risk would have been increased by the departure of the vessel in July, instead of May. Had it been so regarded by the underwriters, it is probable that the time of sailing, would have formed one of the stipulations in the policy. In the absence then of any inducement to make a representation of such a character as that insisted on by the appellees: when too, the distance of the port of departure from the place of insurance, was so great as to render it most improbable, if not morally impossible, that the assured could know the precise time of sailing, would it not be more rational, more equitable, to regard the expressions of the insured, rather as the emphatic, confident statement of

a matter of opinion or calculation, than as a representation in its technical sense.   If this order for insurance under the circumstances in which it was drawn, will bear two interpretations, according to the case of *Livingston and Gilchrist vs. The Maryland Insurance Company,* 7 *Cranch,* 536, "the insurers ought to have asked an explanation and not substitute their own conjectures for an alleged representation."   If the insurers, in this case, intended to exact a literal compliance with the statement of the time of sailing in the offer for insurance, they should have made it the subject of a warranty, or have informed *Allegre* that they relied on it as a representation.   Had the statement been, that the vessel *had sailed ;* and it were a fact of which its knowledge could be imputed to the insured, *it might perhaps* be regarded as a representation.   But in this case a future event is spoken of, in its nature contingent, and of which the party speaking could not possibly possess any certain knowledge.   As supporting the view here taken of this subject.   *Phil. Ins.* 83, 84.   *Christie vs. Secretan,* 8 *T. R.* 192. *Hubbard vs. Gover,* 3 *Campb.* 312.   *Bowden vs. Vaughan,* 10 *East* 415.   *Brice vs. Featherstone,* 4 *Taunt.* 869. and *Jendivine vs. Slade,* 2 *Esp. R.* 572, may be referred to.   Also the very strong case of *Rice and others vs. The New England Marine Ins. Com.* 4 *Pick. Rep.* 439, where Chief Justice *Parker,* in delivering the opinion of the Court, emphatically states :   "We think that the statement of the day on which a vessel will sail, is substantially nothing more than stating an expectation that she will sail on that day."   "The most positive intentions to sail on any future day, amount only to a strong expectation, for it must depend on the elements and other causes affecting the sailing of vessels, whether such intention shall be executed or not.   And if the time of sailing be material to the risk, the insurer would be as likely to require a warranty, that the vessel would sail or had sailed on the day proposed, if it were stated positively, as if stated only as an expectation."

In opposition to the above references must perhaps be regarded the case of *Dennistown and others vs. Little and others*, recently decided on appeal to the House of Lords, and reported in 3 *Bligh*, 202. But of this case it may be said, that the grounds of the decision are unsatisfactory, and indistinctly stated: and that viewing it even in the light of conclusive authority in this case as to the question adjudicated, it is by no means decisive of the point now under consideration, as presented by the facts in this record. In that case the statement was, the *Brilliant* will sail on the 1st of May: the fact was that she had sailed on the 23d of April, preceding, and was at that time a " missing vessel." The assured there appeared as owner as well of the vessel as of the cargo, both being covered under the same policy. And upon this last ground the *Lord Chancellor* mainly rests his opinion : and draws the distinction between the case before him, and that of *Bowden vs. Vaughan*, the decision in which he recognizes and sanctions. In the case before us, the policy was solely on the cargo; and the underwriters had no reason to presume, that the owner of the cargo had any interest in or control over the vessel. The question now to be settled, therefore stands unaffected by the decision in 3 *Bligh*.

The order for insurance as regards the time of sailing being deemed no representation, the instruction of the Court to the jury, in the appellants first bill of exceptions, was wrong upon two grounds. *First*, because it was wholly immaterial to the issue in the cause whether the risk were materially increased or not, by the sailing of the brig at a different time from that stated in the order for insurance, such statement being no representation. *Secondly*, because the Court submitted it to the jury, to find the fact, that the risk had been materially increased, when no testimony whatever had been adduced on that subject, to warrant the jury in drawing such a conclusion.

To the opinion of the Court, in the appellants second bill of exceptions, but little opposition was made in the argu-

ment, and to the admissibility of the testimony there offered, we are aware of no well founded objection.

We concur with the County Court in their refusal of the prayers of the appellants, set forth in their third bill of exceptions. If proof of facts were requisite to demonstrate the far greater perils, to which a live cargo is exposed in a sea voyage than a dead cargo; the result of the adventure in controversy, and the testimony given in this cause, are most conclusive; 106 mules and 4 jackasses were shipped on board the *Eugene.* By tempestuous weather, which to a dead cargo would have occasioned no injury, 94 mules and all the jackasses were destroyed. On board the *British brig Palmyra*, 170 or 180 mules were laden, on a voyage from *La Plata* to *Havana:* on her arrival at the port of destination, but 33 were alive; 4 or 5 of which soon after died: a common cargo exposed to such perils would in all probability have escaped uninjured. In transporting a cargo of live stock, a great portion of it is stowed upon deck, and consequently subjected to casualties, from which a cargo under hatches is wholly exempt. Indeed so much greater are the estimated risks to goods on deck, than to those in the hold, that double the premium of insurance is demanded for the former, that there is for the latter : And on account of this great diversity in the amount of premium, a policy, on " cargo," or " goods and merchandize," will not cover articles which are stowed upon deck. If the vessel be wrecked or stranded, the chance of saving a dead cargo, is far greater than that of saving a live cargo. In fact, the disadvantages to the assurer attendant on the latter risk, which are not incident to the former, are so numerous and obvious that they need not be enumerated. In compacts then of which good faith and fair dealing are the very essence ; where it is said to be the duty of the assured to communicate " every fact and circumstance which can possibly influence the mind of any prudent and intelligent insurer, in determining whether he will underwrite the policy at all, or at what premium he will underwrite it,"

ought not the insured to be informed of it, where live stock are the subject of insurance? There is no rule of law or decision of any Court of this State or elsewhere, as far as our researches have extended, which excuses the insured from making such a communication: commercial policy enjoins it; justice demands it; as far as the testimony in this case goes, the usages of underwriters require it, and the highest judicial tribunal in a sister State, hath adjudged it to be indispensable. Should we then hesitate to adopt it? An uniformity of decision among the several States of the Union, on subjects of this nature, is of vast importance to the mercantile community; and that consideration alone, in the absence of all motive or obligation to embrace a contrary doctrine, should induce us to sanction the principle established in one of the most enlightened and commercial States in the Union, that a policy on cargo, goods or merchandize, will not cover live stock. The adjudication alluded to, is reported in 4 *Pick. Rep.* 429. *Talcot Woolcot et al. vs. Eagle Insurance Company.* If it had been in proof that mules or live stock were the only articles of exportation from *La Plata* to *Martinico* and the *Havana,* this would give a new aspect to the case. It would not then be necessary for the insured to notify the insurer of the character of the cargo. That fact having already been made known to him from the nature of the trade, of which the law presumes him to have knowledge. These remarks are made, as applicable to the prayers of the appellants, and with reference to the general principles of the law of insurance, not upon the rights of the appellants resting upon any usage of trade prevailing in the city of *Baltimore.*

Having approved of the Court's refusal to grant the two instructions asked for in this *third* bill of exceptions, it remains to be considered whether there be any error in the opinion delivered by the Court, of which the appellants have cause to complain. That there is, to us appears obvious. The Court undertook to determine the question of fact, that the appellants were guilty of a concealment fatal

to the policy, provided the jury believe that the risk was materially increased by the cargo being of mules, instead of a dead cargo, "and that this material increase of risk, was the only question open for the consideration of the jury." In doing so, they threw out of the case the testimony offered by the appellants, "that the term cargo, in the aforesaid order for insurance, would, according to the mercantile understanding and usage of trade among the insurers, and merchants of *Baltimore,* be considered as covering mules and jackasses;" thus, in effect, determining a controverted matter of fact, of the truth of which contradictory evidence had been offered. If the facts had been left to the jury, as they ought to have been, and they had found that there did exist such a mercantile understanding and usage of trade in *Baltimore,* upon the whole evidence offered in the cause, it was competent for the jury to have rendered a verdict for the appellants, notwithstanding the shipment of mules materially increased the risk which would have been incident to a dead cargo.

We concur with the County Court in their opinion in the appellants *second* bill of exceptions, but dissent from their opinions in the *first* and *third* exceptions·

JUDGMENT REVERSED AND PROCEDENDO AWARDED.