(Decided July 22nd, 1858.)

---

# THE AUGUSTA INSURANCE AND BANKING COMPANY OF GEORGIA, *vs.* EDWIN A. ABBOTT.

A policy of insurance is not a negotiable security, and the general clause, "*for whom it concerns,*" only avails for the person for whose benefit it was *intended when obtained,* by the party obtaining it, and whether it was so intended for one claiming the benefit of it, is a question of *fact* for the jury.

Where a policy provides that it shall be void, "in case of its being *assigned* or *transferred* or *pledged without* the *previous consent, in writing, of the insurers,*" an assignment without such consent confers no right upon the assignee.

So far as *good faith* in *obtaining* the insurance is concerned, a policy issued "*for whom it concerns,*" stands on the same ground as any other; for every such policy *supposes an agency,* and one who claims the benefit of it, is *bound* by the *acts* and *representations* of the parties or agents connected with the business of *procuring it,* although obtained without his knowledge.

If any *misrepresentation* or *concealment* of facts *material to the risk* be shown on the part of the agents or parties obtaining such a policy, it is void, no matter how innocent the party for whom it was *intended* may be, and no matter whether such misrepresentation or concealment be fraudulent, or the result of negligence or inadvertence on the part of such agents or parties.

The utmost good faith and fair dealing are of the very essence of the contract of insurance, and every fact and circumstance which can possibly influence the mind of any prudent and intelligent insurer, in determining whether he will underwrite the policy at all, or at what premium, ought to be communicated to him.

A statement made to the insurers, that the vessel "is about ready to sail," or "she will sail soon," is not a promissory representation as to the time

or sailing, which binds the assured and the breach of which will vitiate the policy.

In answer to the question, "what is the condition of the vessel as to seaworthiness?" a representation that she is a *"good old vessel,"* imports no more than that she is *seaworthy.*

Where a representation is made merely *on information,* the assured is not answerable for the truth of the *facts* stated, but only for the truth with which he has *stated* the *information received.*

In a policy on a cargo of *lumber,* the implied warranty is, that the vessel is seaworthy to transport *such a cargo,* and a statement to the insurers, that on a previous voyage she had carried a cargo of *coal* without insurance, did not enlarge that warranty so as to require the insured to prove she was seaworthy to carry *coal.*

The difference between a *representation* and a *warranty* is, that while the latter must be *literally* fulfilled, it is sufficient if the former be *substantially* complied with.

Seaworthiness is an *implied warranty* in every contract of insurance, and the assured need not, *in the first instance,* disclose any fact however material to the risk, which tends to show the ship was unseaworthy when she sailed.

But when *inquiries* are made as to matters embraced in an *implied warranty,* such inquiries may render it necessary for the assured or his agent to disclose facts respecting which he might otherwise be silent.

An inquiry, "what is the condition of the vessel as to seaworthiness?" is general and indefinite, not pointing to any particular fact, and imports no more than an inquiry as to whether she was seaworthy.

Such an inquiry imposed no obligation upon the assured, to disclose facts tending to show the insufficiency of the vessel to carry a cargo of coal, or that she had been *discredited* by the marine insurance reports of the port where she was lying, or that ineffectual attempts had been made to get her insured there.

It is well settled that the assured is not bound to disclose the fact, that the risk has been declined by others or the estimate they put upon it, unless information on the subject be particularly called for.

Under a policy on a cargo of lumber *"at* and from Baltimore to Boston," the risk commences from the time the lumber is laden on board the vessel, and a *deviation* thereafter will avoid the policy, whether it occurs *before* or *after* the vessel actually leaves the port of departure.

A deviation avoids the policy because it *varies* the risk, and *delay* in commencing or prosecuting the voyage is as much a *deviation* as a divergence from its prescribed course, and will discharge the underwriters if *unreasonable* or *inexcusable,* and this rule applies as well to a policy *on cargo* as on *the vessel.*

Not to deviate is as much an implied warranty in every insurance on a voyage, as the seaworthiness of the vessel, and each of these warranties is implied whether the policy be on the *ship* or on the *cargo.*

A delay, from the 19th of November to the 22nd of December, in *commencing* the voyage, is unreasonable, amounts to a deviation, and will discharge the policy on the cargo unless it proceeds from causes which justify or excuse it.

What the actual causes of delay are, is a question of *fact* for the jury; the legal sufficiency of such causes, to justify or excuse it must be decided by the court.

Delay resulting from the difficulty in obtaining a crew is excusable; but if occasioned by proceedings instituted in the Circuit Court of the United States, in admiralty, for the recovery of debts due for repairs to the vessel, by which she was seized, detained and sold, it is not excusable.

The underwriter does not run the risk of obstructions occasioned by the debts, insufficient acquittance, or neglect to pay debts of the assured, and this rule applies whether the policy be on the *vessel* or on the *cargo;* detention for such cause is not covered by the terms, "restraints and detainments of all kings, princes or people."

Where a delay in commencing the voyage is occasioned by debts of the vessel previously existing, and contracted without reference to the particular voyage, and the owner of the *cargo* insured is on the spot, the master cannot sell or hypothecate the *same* to pay such debts, except with the consent and authority of such owner, whom he must consult.

A prayer, after stating certain facts hypothetically as the basis of the legal propositions, contains the clause, "and if the jury shall find *all other facts assumed by this prayer,*" HELD, that this clause is objectionable as tending to mislead the jury, and vitiates a prayer otherwise good.

The refusal of the court in a trial of a cause at *nisi prius,* to permit counsel to read to the jury the law from books, is a matter within the *discretion* of the court, and is not a subject of appeal.

APPEAL from the Superior Court of Baltimore city.

*Assumpsit* brought on the 10th of December 1853, by the appellee against the appellant, on a policy of insurance underwritten by the defendants through its agents, Page and Banks, at Boston, on a cargo of lumber, to the amount of $3500, per Brig Orb, at and from Baltimore to Boston. Plea *non assumpsit.*

The policy is dated the 28th of October 1852, and insures "Parker Fall *for whom it concerns,* $3500 on lumber, viz., $3200 under deck, and $300 on deck, per Brig Orb, *at and*

Augusta Insurance & Banking Co. *vs.* Abbott.

*from* Baltimore to Boston," and by it the insurers "confessing themselves paid the consideration due unto them for this insurance by the insured, at and after the rate of one per cent and three per cent on deck," take upon themselves perils "of the seas, fire, enemies, pirates, assailing thieves, restraints and detainments of all kings, princes or people, of what nation or quality soever, *barratry of the master, (unless the insured be owner of the vessel,)* and of mariners and all other losses and misfortunes, which have or shall come to the damage of the said property, or any part thereof, to which insurers are liable by the rules and customs of insurance in Boston;" "and in case of loss, such loss shall be paid in sixty days after proof and adjustment thereof, the amount of the premium note if unpaid, and all sums due to the company from the insured, when such loss becomes due, being first deducted." It was also agreed, among other stipulations, "that in case of capture or *detention,* the insured shall not have the right to abandon therefor, until proof is exhibited of condemnation, or of the continuance of the detention (by capture or *other arrest,)* for, at least, *ninety days,"* and "that the insurers shall not be answerable for any charge, damage or loss, which may arise in consequence of seizure or *detention* for or on account of illicit or prohibited trade," and *"that this policy shall be void in case of its being assigned, transferred or pledged, without the previous consent, in writing, of the insurers."*

On the back of this policy was the following endorsement or assignment: "Baltimore, 18th November 1852. I hereby transfer all my right and interest in the within policy to E. A. Abbott, *for myself and other owners,"* (signed) "John H. Frisbie," in the hand-writing of one of the plaintiff's clerks, except the words "for myself and other owners," and the signature, which were in the hand-writing of Frisbie the *captain,* and, at that time, *part owner* of the vessel. One of the grounds upon which the action was resisted was, that this assignment was illegal, not having been made "with the previous consent in writing of the insurers," according to the condition of the policy.

The lumber was ladened on board the Orb, by the 19th of

November 1852, and she sailed on the 22nd of December following, was wrecked in Hampton Roads on the 3rd of January 1853, and by this disaster, loss and damage resulted to the cargo. The defences were, that the policy had been discharged, 1st, by that kind of *delay*, in the inception of the voyage, which amounted to *deviation* in construction of law; 2nd, because of misrepresentation as to the time of sailing; 3rd, because of misrepresentation and concealment of material facts as to the condition of the Orb, which, if they had been truly communicated to the defendant's agents, would have caused the risk to have been declined or the premium enhanced; and 4th, because the policy was not certainly intended to cover the cargo of the plaintiff, who had therefore, no such interest in the policy as to give him a right of action upon it. Evidence upon all these points was offered by both parties, and is sufficiently indicated in the instructions acted on by the court below, the arguments of counsel, and the opinion of this court. The letter of Frisbie to Fall, so frequently referred to, is as follows:

"BALTIMORE, October 20th, 1852.

MR. FALL:

*Dear Sir:*—I have taken up two or three times with lumber for Boston, and have to give it up on account of insurance, they cannot get her insured at no price, and I could not get the coal freight to Providence; there was one man said he would load her without insurance, and I waited for him two weeks, and was to commence this morning, and his partner came home and would not let him ship it. I should like for you to see Mr. Mayo, and see what can be done, I do not know of any thing but to go down the bay and buy a load of wood, there is a cargo of plank here already, if you can get it insured, telegraph to Wm. Rhodes as soon as you receive this. and I will have her loaded up and pay her expenses, which I cannot pay without. I have written two or three times before.

Respectfully Yours,    JOHN H. FRISBIE."

*1st Exception.* The plaintiff offered the following prayers:

1st. That the law presumes that the Orb was seaworthy, for the performance of the voyage from Baltimore to Boston,

given in evidence in this case, until the contrary is proven, and that the burthen of proof of her unseaworthiness for the performance of said voyage, is upon the defendant.

2nd. If the jury believe from the evidence, that at the inception of the voyage mentioned in the evidence, the Orb was sufficiently tight, staunch and strong, for the performance of the voyage from Baltimore to Boston, with the cargo of lumber mentioned in the evidence, and that she was properly officered, manned and equipped for the performance of said voyage with said cargo, and that on said voyage, through storm and perils of the sea the said cargo was lost in whole or in part, the plaintiff is entitled to recover in this case to the extent of such loss, although the jury shall believe from the evidence, that there was delay or negligence upon the part of the captain of said vessel in commencing said voyage.

The defendant then offered the following prayers:

1st. That the plaintiff cannot recover if the jury believe from the evidence, that when the Orb sailed from Baltimore in December 1852, she was not a sufficiently sound and staunch vessel for the voyage, at that season of the year from Baltimore to Boston, with the cargo insured, or if the jury find from the evidence that she was not supplied at that time, nor afterwards with such sails, chains and anchors, as were proper precautions for a vessel of her tonnage, in view of the ordinary and probable perils of said voyage.

2nd. That there was an implied warranty by the plaintiff, that the voyage should be made in the usual and direct course for seaworthy vessels, conveying from Baltimore to Boston such cargo as was the subject of insurance in the policy in suit, and any deviation can only be justified by necessity or lawful cause.

3rd. If the jury believe from the evidence, that the Orb was seaworthy for the purpose of lying in port, that her cargo was on board by the 19th of November 1852, that repairs and supplies had been ordered and contracted for by her master and owners, and had been done and furnished before the 20th of November 1852, that by reason of the refusal or inability of said master and owners, to pay for such supplies and repairs, the

45     v. 12.

vessel was seized, detained and sold, under the libel and decree of the Circuit Court of the United States for the District of Maryland, given in evidence, so that she did not in fact sail from Baltimore, by some days, as soon as she would have done in case she had not been so seized and sold, then the plaintiff cannot recover, provided the jury find all the other facts assumed in this prayer, and that no effort to pay for said repairs and discharge said libels was made by the master, by sale or hypothecation of the cargo to a sufficient extent, and that no loss or damage occurred to the cargo insured before the 2nd of January 1853.

4th. If the jury believe from the evidence, that it would have varied the risk and premium, accordingly as the vessel sailed in November or December 1852, so that the risk would have been declined, or a higher premium charged, if it had been known to the defendant's agents at Boston that the Orb would not sail sooner than the 20th of December 1852, and that this was known at the time of the application for the policy sued on by both Parker Fall and defendant's said agents, and that with a view of deciding on this contingency, said agents did ask Fall, when he applied for said policy, when the Orb would sail from Baltimore, and that Fall then represented that she would sail soon, and that the cargo insured was in fact ladened on the vessel by the 19th of November 1852, and that full, reasonable and sufficient time, to have been expected by the parties to the contract, for the commencement of the voyage had elapsed by the 25th of November 1852, then the plaintiff cannot recover, if the jury find that the Orb did not sail from Baltimore before the 20th of December 1852, from the causes given in evidence, provided they find that no loss or damage occurred to the cargo insured before the 2nd of January 1853, and also find all other facts assumed in this prayer.

5th. If the jury believe from the evidence, that Fall applied to defendant's agents at Boston, for the policy sued on by direction of John H. Frisbie, contained in the letter of said Frisbie, of the 20th of October 1852, given in evidence, and that at the time of such application, said agents enquired of Fall, where the Orb then was, and what was her condition as to

seaworthiness? and that, in reply thereto, Fall represented that the Orb was in Baltimore, and was a good old vessel, and on the voyage before she brought a freight of coal from Philadelphia to Charlestown, and on that voyage her cargo was not insured, as the man whom she brought the cargo for never had his cargoes insured as said Fall understood, and that before said letter, of the 20th of October, was written, a cargo of coal which had been put by E. Pratt of Baltimore on board the Orb for conveyance to Providence, had, shortly before the said 20th of October, been necessarily discharged at Baltimore on account of the leaky condition of the vessel whilst said Frisbie was master and part owner of her, and that Frisbie was then advised not to take another cargo of coal, but to freight the Orb with a cargo of lumber, so that her seaworthiness would not be so severely tried, and that accordingly said Frisbie declined an offer from E. Pratt, before the said 20th of October, to freight the Orb again with coal, after the cargo of coal had been discharged as before stated, and if the jury further find, that a vessel must be more strong, staunch and seaworthy, to carry a cargo of coal by sea than a cargo of lumber, and that before the said letter of the 20th of October was written, Frisbie knew that the Orb had been characterised in October 1852, as an unseaworthy vessel, by the report of the inspector of ships for the insurance offices at the port of Baltimore, and that when, as before stated, Fall was enquired of as to the seaworthy condition of the Orb, none of the above facts nor the contents of said letter were communicated by him to the defendant's agents at Boston, except as hereinbefore expressly stated so to have been communicated, and if the jury believe that if the above facts, or most of them, or the contents of said letter had been then communicated to them, said agents would have declined the risk or enhanced the premium, then the plaintiff cannot recover, provided the jury believe the premium had never been paid to the defendant, and all other facts assumed in this prayer, and if they believe the premium has been paid, then the plaintiff is only entitled to recover that and its appropriate interest, in case no fraud was intended by the parties applying for the policy, by the representations made and failure to disclose their information.

6th. If the jury believe from the evidence, that matters material to the risk as affecting the seaworthiness of the Orb, and which would have affected the premium or caused the insurance to be declined by the defendant's agents, when application was made for the policy in suit, were either known to Fall or Frisbie, so that they could with reasonable diligence have been communicated to said agents at that time by either of them, and if the jury believe that such facts were not, in fact, communicated to said agents then or before the loss proved in evidence, and that when said application was made, said agents enquired of Fall where the Orb then was, and what was her condition as to seaworthiness, then the plaintiff cannot recover, provided the jury believe the premium was never paid to defendant, and all the facts assumed in this prayer, and also believe that the application was made by reason of the said letter of the 20th of October, and in case they believe the premium has been paid, the plaintiff is only entitled to recover that with its proper interest in the absence of fraud.

7th. That the assured was under an implied warranty that the vessel should sail on her voyage with all safe, convenient and practicable expedition, and that if this was not done by reason of the acts of her master or owners, in not providing funds for repairs and supplies furnished said vessel, and if the jury find there was no effort made to obviate this delay, by sale or hypothecation of the cargo in whole or in part, by either master or owner of the Orb, then the plaintiff cannot recover, provided the jury believe that the loss occurred after said vessel sailed in fact, and that the premium was never paid to the defendant, and all other facts assumed in this prayer, and in case the jury believe the premium has been paid, then the plaintiff is not entitled to recover, if they find that the delay of the voyage occurred after the 19th of November 1852.

The court (Frick, J.) granted both the plaintiff's prayers, and also the first prayer of the defendant, but rejected all the defendant's other prayers, and the defendant excepted to the granting of the plaintiff's second prayer, and to the rejection of its prayers.

2nd. Exception. After the evidence had been closed on both

sides, and the action of the court as stated in the preceding exception, the plaintiff's counsel opened the case to the jury, was followed by the junior counsel for the defendant, and the senior counsel for the defendant then addressed the jury till the adjournment of the court for the day, without concluding, and on the succeeding morning before continuing his argument, offered the defendant's eighth prayer as follows:

8th. If the jury believe from the evidence, that when Fall applied for the policy sued on, he was asked by the defendant's agent at Boston, to whom he applied as to the then condition of the Orb as to seaworthiness, and that Fall was then making said application by virtue of the instructions contained in the letter of Frisbie, given in evidence under date of the 20th of October 1852, and that said letter contained facts or implications connected with the condition of the Orb, at that time, as to seaworthiness, which were not communicated to the insurer's agents at Boston by Fall, and which would, if they had been communicated, have induced the underwriters either to decline the risk or to enhance the premium, and if the jury find that the premium has not yet been paid to the defendant, then the plaintiff cannot recover, though Fall had no fraudulent or deceptive motive in what he did or did not do, provided the jury find all the other facts assumed in this prayer, and if the jury find the premium has been paid, then the plaintiff is only entitled to recover that and its appropriate interest, in case they believe no fraud was intended in the failure to communicate the material information to the underwriter.

The counsel for the plaintiff then stated, they would expect to be heard on this prayer, if the court saw fit to entertain it at all; but the court rejected the prayer, as well because it was offered too late, under the rules of the court, as because it was not the law of the case. To this ruling the defendant excepted.

*3rd. Exception.* After the trial had progressed, as stated in the preceding exceptions, the senior counsel for the defendant, in the progress of his argument of the facts before the jury, proposed to read to the jury Chancellor Kent's opinion or doc-

trine on a matter of law involved in the case, as expressed in better language than his own, which being objected to by the other side, the court refused to permit, under the invariable practice of that court since its institution, the law to be read from books, conceding and offering the right of the counsel to state the law to the jury, subject to an appeal to the court if dissented from by the other party. To this refusal and ruling the defendant excepted.

The verdict was in favor of the plaintiff for $3374.56, damages, with interest and costs, and from the judgment thereon rendered the defendant appealed.

The cause was argued before Eccleston, Tuck and Bartol, J.

*A. S. Ridgely* and *Wm. H. Norris* for the appellant:

1st. The policy was discharged and the underwriters absolved from liability by the unjustifiable delay in commencing the voyage. This delay amounted to a *deviation,* and the insured *on cargo* is in no different right in this particular than the policy holder *on a vessel.* This is *irrespective* of any *representation* as to the time of the vessel's sailing. A stipulation against deviation—and delay from *unjustifiable cause* is deviation—is an *implied warranty* in *every* policy of marine insurance. "In short, whenever the delay exceeds a reasonable time, or is incurred for purposes unconnected with the true object of the voyage insured, it will amount to a deviation." (1 *Arnould on Ins.,* 42, 341, 342, 383, 387, 390, 400. 1 *Phillips on Ins.,* secs. 690, 692, 981, 983, 984, 988, 989, 995, 996, 998, 1002, 1020, 1021, 1031, 1050. 9 *Mass.,* 448, 449, *Coffin vs. Newburyport Marine Ins. Co.* There is no distinction between a policy holder *on goods* and on the *vessel,* each is responsible for the master and for *deviations.* 2 *Smedes & Marshall,* 375, *Natchez Ins. Co., vs. Stanton, et al. Weskitt on Ins.,* 169, 179. 7 *H. & J.,* 291, *Riggin vs. Patapsco Ins. Co.* 8 *Mass.,* 321, 322, *Cleveland et al., vs. Union Ins. Co.* 24 *Eng. Law & Eq., Rep.,* 36, *Gibson vs. Small,* and same case in 71 *Eng. C. L. Rep.,* 157. *Park on Ins.,* 294,

295. The reason of thus holding the insured *on cargo* responsible for a deviation is, that a stipulation against deviation is an *implied warranty* in the *policy*. It is admitted by the counsel for the appellee, that a deviation in *the course of the voyage* would vitiate a policy on goods. Why so? The *owner of the cargo* has no more control over the action of the master as to the prosecution of the voyage, than he has as to its *commencement*. It is therefore only and solely because of this implied warranty, that the insured *on cargo* is responsible for a deviation in the course of the voyage. And this same warranty, according to all the authorities, applies as well to a deviation occasioned by an *unjustifiable delay in the commencement* of the voyage, as to an actual turning from the usual route in the progress of the voyage. In addition to the cases before cited, reference is made to the following authorities, all of which were cases of policies on goods, and the distinction here attempted to be drawn was not even alluded to. 14 *Eng. C. L. Rep.*, 4, *Hare vs. Travis.* 7 *Term Rep.*, 505, *Phyn vs. Royal Exchange Ins. Co.* 4 *Eng. C. L. Rep.*, 246, 248, *Roscow vs. Corson.* 55 *Eng. C. L. Rep.*, 781, *Oliverson vs. Brightman.* 2 *Wash. C. C. Rep.*, 7, *Winthrop vs. Union Ins Co.* 3 *Wash. C. C. Rep.*, 168, *Poppleston vs. Kitchen.* 3 *Mass.*, 331, *Taylor vs. Lowell. Ibid.*, 409, *Stocker vs. Harris.* 3 *Pick.*, 172, *Hale vs. Mercantile Marine Ins. Co.* 11 *Johns.*, 352, *Graham vs. Commercial Ins. Co.* 23 *Missouri*, 553, *Salisbury vs. Marine Ins. Co.* The ship owner is answerable to the freighter or charterer for the acts of the captain. *Abbott on Shipping*, 344, 362. 8 *Pick.*, 159, *Hobart vs. Norton.* 5 *Ohio*, 436, *Lodwicks vs. Ohio Ins. Co.* The delay of the vessel in this case, in port, by the libels from the District Court, for supplies furnished anterior to the 20th of November 1852, is a clear deviation, for which the shipper of goods is answerable by the discharge of his policy, and his remedy is against the owners or master, for not having liquidated these bills and enabled the vessel to sail. It was competent for the master to have sold or hypothecated the cargo to enable his ship to sail. *Abbott*, 372, *note* 2. 9 *Johns.*, 30, *Fontaine vs. Col-*

*umbian Ins. Co.* 3 *Story's Rep.*, 491, 492, *Pope vs. Nick-erson.* 3 *Mason.* 260, *Ship Packet.* The shipper could have unladened his cargo and sued the owners for expenses and damages, if the vessel was detained by the neglect or ina-bility of the captain to pay for these supplies and repairs, *(Abbott,* 412, *notes,)* though it is not contended, that the lia-bility of the ship-owner for a loss on the cargo, by the fault of the master and crew, necessarily exonerates the underwriters. 1 *Phillips, sec.* 1052.

It is supposed by the counsel for the appellee, that what-ever might have been the law in earlier days, that a different rule has been recently established in this State, by the case of *Georgia Ins. & Trust Co., vs. Dawson,* 2 *Gill,* 369, 370. But that case merely established, that the negligence of the master as to the stowage of cargo, was neither covered by im-plied warranty nor by any express one in the policy in suit. Mr. Phillips cites the case without any suspicion that it was in-troductory of any change in the *law of deviation.* 1 *Phillips,* 592. The fact is, there are certain implied warranties, which if fulfilled at the commencement of the risk, make the negli-gence of the master and crew thereafter chargeable to the in-surer, if loss occurs from any of the enumerated perils, and this Maryland case is an instance. But there are other implied warranties which remain in obligation to the end of the voy-age, and any breach of them by the master or mariners is at the risk of the insured. Such is the implied warranty as to de-viation. After stating the law as to the first class, and the doc-trine of *proxima causa,* Mr. Phillips, (sec. 1050,) says: "This doctrine is limited to the acts and neglect of the master and crew, as such, in conducting the voyage or in charge of the subject. It intercepts and prevents a forfeiture of the insur-ance by reason of unseaworthiness, resulting from or continu-ing by reason of carelessness or mistake of the master or crew, *but it does not prevent a forfeiture by deviation,* which is in effect a violation of an express stipulation of the policy, im-ported by the mere description of the voyage," Nor is the law of deviation simply applied to the commencement and course of the voyage. A tardy landing of goods at the port of

destination, is a deviation which discharges the underwriter. 1 *Phillips, sec.* 998. Nor is the law silent as to the specific cause of deviation in this case. "The doctrine is laid down in *La Guidon de la Mer*, that the underwriter does not run the risk of obstructions occasioned by the *debts*, insufficient acquittance or neglect to pay debts of the assured. The underwriters were held, in New York, not to be liable for the aggravation of a loss, by reason of the assured's not providing for supplying means to the master of an American vessel, to raise funds to repair at the island of St. Thomas in the West Indies." 1 *Phillips, sec.* 1046. 20 *Wend.*, 287, *American Ins. Co., vs. Ogden.* 1 *Camp.*, 265, *Jarratt vs. Ward.* What facts constitute a deviation, is a question of law for the court, and "the court and not the jury are the judges whether the deviation be justifiable." 7 *H. & J.*, 291. 2 *Phillips*, 585. 2 *Smedes & Mar.*, 375.

2nd. The policy was discharged or rendered void, by the misrepresentation or concealment of material facts connected with the condition of the vessel. As to this part of the case, it is contended by the counsel for the appellee, that being insured on cargo, and as the policy was "for whom it concerns," he cannot be affected by the acts or misrepresentation and concealment of the captain acting for the owners of the vessel, or of his agent Parker Fall. This presents, first, the inquiry, whether a policy "for whom it concerns" can possibly be used by any one, free of responsibility for the acts and omissions of those who in fact obtained it? They certainly act as *agents* "for whom it concerns," either originally or by adoption. 7 *H. & J.*, 450, *Newson vs. Douglass.* The subsequent adoption of this policy cannot exempt it from the law of concealment, and of fraud or misrepresentation in its procurement; for all such policies presuppose *an agency*, and that the parties obtaining them are the *agents* of those who adopt and use them. The proof shows who ordered the policy, and who applied for it. Abbott is, therefore, answerable for Frisbie and Fall and each of them. That the verdict found the vessel seaworthy, does not dispense with the doctrine of misrepresentation and concealment in relation to her seaworthiness; for

there are grades and degrees of this, which affect the risk and vary the premium, or cause an insurance to be declined. The first step is to ascertain the general principle which is to be the law of duty to agents applying for insurance. It is the familiar one of *uberrima fides*. 2 *G. & J.*, 162, *Allegre vs. Maryland Ins. Co.* We are next to see the principles of construction, which are to expound any representation made, premising that "the object of the assured in making a representation usually is to reduce the premium by showing the real to be less than the apparent risk." 2 *Duer on Ins.*, 656. 1 *Arnould*, 489, 492. "A representation imports not only what is expressed, but also all the natural and obvious inferences from it." 1 *Phillips, secs.* 567, 550. The "insured is required, as a preliminary step, to communicate to the underwriter all other" (excepting those the underwriter is bound to know) "material facts within his knowledge, or presumed to be so, or of which he is bound to be informed, that would directly tend to induce the underwriter not to subscribe the policy at all or to demand a higher premium." 1 *Phillips, sec.* 571. There is an additional principle which affects and controls the preceding one, as to representation and concealment; "matters of implied agreement in the policy need not be represented by the assured in the first instance, but he is bound to make true answers to inquiries by the underwriter, relating to matters of implied warranty. And though no such inquiries are made, still, if the assured voluntarily make representations of this description, he will be bound thereby, and the policy will be void unless they are substantially true." 1 *Phillips, sec.* 601. 1 *Arnould*, 515, 517, 518. 2 *Duer*, 572 to 581. The duty of the assured to answer truly questions, as to matters covered by implied warranties, shows that there are grades of differences in those matters, which may affect the underwriter's judgment as to taking the risk at all, or the premium at which it will be taken. In other words, that the underwriter wishes to know more than the mere implied warranty of itself communicates. 1 *Phillips, sec.* 586. 8 *Pet.*, 581, *Hazard vs. New England Marine Ins. Co.* The moment, therefore, that the underwriter inquires as to such matters, the whole law of con-

cealment and representation is brought to bear on the assured. As to the points enquired of, the assured is in the predicament as to disclosure and truthfulness, which the law imposes on him as to other matters which he is bound to communicate and represent truly to the underwriter in the first instance. 1 *Phillips.* sec. 601. 4 *East.,* 590, *Haywood vs. Rodgers.* Now, if seaworthiness were not a matter of implied warranty, what would the assured in this case have been bound to apprise the underwriters of, under the rule requiring him to inform them "of all material facts within his knowledge, or presumed to be so, or of which he is bound to be informed, *that would directly tend to induce the underwriters not to subscribe the policy at all, or to demand a higher premium?*" If the *inquiry had been made* as to her then condition of seaworthiness, would not the owner of the vessel in the case of *Haywood vs. Rodgers,* have been bound to communicate the letter, which stated that "the ship was in very good order, but that he had a survey on her *on account of her bad condition?*" "A question of seaworthiness is determined by the usages of the port where the vessel is fitted out, in reference to the destined voyage." 8 *Pet.,* 581. Seaworthiness is variable, and relates to the voyage and cargo to be transported. 1 *Phillips,* sec. 720, *note* 3. The implied warranty only relates to seaworthiness, for the voyage proposed with the cargo proposed. The proof shows, that a vessel may be seaworthy to carry lumber and not so to carry coal. The verdict has only found, that the vessel was seaworthy to transport lumber from Baltimore to Boston. But that was not the inquiry put to Parker Fall, nor was that the representation he made. The insurer had the right to make the inquiry as to the *general* seaworthiness of the vessel, and it was the duty of Frisbie to have provided his agent with the means of fully answering the question, and more especially the duty of Fall to have supplied the insurers with all the information that had been communicated to him by Frisbie's letter of the 20th of October 1853. This was required by the law of concealment *after the inquiry had been made.* 2 *Paine's C. C. Rep.,* 84 to 90, *Buckly vs. Providence Ins. Co.* The fallacy is in supposing, that, as the

verdict has found seaworthiness for the particular voyage with the particular cargo, nothing has been concealed and nothing misrepresented. But as it often happens that the representation of the assured, or information of the insurer, reduces the implied warranty in favor of the assured, (1 *Phillips, sec.* 602; 2 *Duer*, 671,) so, on the other hand, *when inquiry is made* that may call for disclosure of facts beyond those covered by the implied warranty, the representations made may avoid the policy by their untruthful or deceptive character, *even though the implied warranty is complied with.* 2 *Duer*, 670, 671. 1 *Phillips, sec.* 586. In *Hazard vs. New England Marine Ins. Co.,* 8 *Pet.*, 581, the court says: "A question of seaworthiness is determined by the usages of the port where the vessel is fitted out, in reference to the destined voyage. But the facts stated in a representation, may go beyond those usages; and the insured is bound to the extent of his communication, whether verbal or written. In the one case the law implies a definite and fixed responsibility; in the other the liability depends on the express declaration of the insured." Whilst, therefore, the insurance was on a lumber cargo, the general inquiry as to her then condition of seaworthiness, called for the communication of the facts, that the marine report at Baltimore had discredited the "*Orb*" as unseaworthy, that she had proved incapable of conveying coal, that her captain had declined a cargo of coal offered by Pratt, and that the letter of the 20th of October also indicated to Fall that she was not deemed fit to transport that kind of tonnage. Yet, in the face of these facts, known either to the captain who ordered the insurance or to his agent who applied for it, the representation was made that she was a "*good old vessel,*" and had "*carried coal* on her last trip from Philadelphia to Charleston, for a man who was *not accustomed to insure his cargoes.* 2 *Duer*, 442, 443. Whether this concealment or misrepresentation was fraudulent or innocent is *wholly indifferent*, provided it has reference to *material facts.* 2 *Duer*, 411, 412, 420 to 422. 20 *Eng. Law & Eq. Rep.*, 341, *Anderson vs. Thornton.* 1 *Arnould*, 536, 537. 20 *Maine*, 130, *Dennison vs. Marine Ins. Co.* And the information must be all

that the latest reasonable diligence could have communicated to the underwriters. 11 *G. & J.*, 256, *Neptune Ins. Co. vs. Robinson.* 1 *Pet.*, 170, *M'Lanahan vs. Universal Ins. Co.*

3rd. Abbott had no interest in the policy, and it was not *certainly obtained* for him but for any one who might freight the vessel; the clause, "for whom it concerns," does not in such case dispense with the necessity of an assignment under the conditions of the policy. These words do not make the policy a *negotiable instrument;* they are only meant to conceal an *existing fact,* and are not so elastic as to cover *any one* who may come in afterwards. The party who seeks to obtain the benefit of such a policy, must have been in the contemplation of the party procuring the insurance, at the time it was procured. 7 *H. & J.*, 450, 451, *Newson vs. Douglass.* 1 *Phillips*, 214. All the proof shows that this policy was not *certainly intended* for Abbott; the *assignment* of the policy to him especially confirms this. At all events, it was, upon the evidence, a question for the jury that the policy was merely got in the hope and expectation that Abbott would ship, and that failing, to induce somebody to freight the vessel; and if they so found, this could not, upon the authorities just cited, be considered an insurable interest in Abbott at the time of the policy.

4th. The eighth prayer of the defendant was seasonably presented. Though the law of it is raised by the plaintiff's second prayer, yet it was competent for the defendant, more specifically to raise the point as to the immateriality of Fall's want of fraudulent and deceptive motive.

5th. The defendant's counsel was entitled to read to the jury the language of Chancellor Kent, subject to the right of objection on the other side, as to its applicability or correctness. 6 *Porter, (Indiana,)* 40, *Selby vs. Wilcox.*

*St. Geo. W. Teackle* and *George M. Gill* for the appellee:

The proof shows, that Frisbie was to get an insurance to cover the cargo to be put on board by the plaintiff, and the plaintiff was, at the time, in the contemplation of the party procuring the insurance, and the party for whose benefit it was

intended. It is immaterial whether Fall then knew for whose benefit it was intended, as he acted under the authority of Frisbie and as his sub-agent, and in this respect this case is similar to that of *Newson vs. Douglass*, 7 *H. & J.*, 452. Hence, the plaintiff by his subsequent adoption of this policy, had a right to avail himself of it, and such adoption is deemed equivalent to his prior order for insurance.

A difference exists between such a case as this, and the case where the party desiring insurance applies by himself or his agent for insurance. An insurance company is bound to be doubly careful when it issues a policy "for whom it concerns." It cannot know for whose benefit it will ensure, or who will claim under it or what use will be made of it. 5 *Cranch*, 100, *Hodgson vs. Marine Ins. Co. of Alexandria.* It must have been issued in this case to give credit to the Orb, and to enable those interested to obtain a freight for her. Here an innocent party who made no representations, who authorised none to be made for him, and who has selected a vessel seaworthy and fitted for the destined voyage with the destined cargo, is sought to be affected by what is alleged to be a concealment of what are said to be material facts, made before he had adopted the insurance, and under circumstances with which it was almost impossible for him to be acquainted, and which, if in point of fact they existed, were unknown to the plaintiff when he adopted the policy. To make him responsible under these circumstances, would be to visit him with the punishment of a wrong-doer, and to enable a party who has caused a wrong to be done him to escape. The insurance company which issues a policy such as this, cannot escape upon a ground of this kind, without bringing home to the plaintiff some participation in the wrong complained of. By issuing this kind of policy a limited negotiability, at least, is given to it, for whosoever was in the contemplation of the party obtaining it, may, although he knew nothing of what had been done, when it was done, by subsequent ratification without limit as to time, or, at least, until the actual satisfaction of the policy, claim the benefit of it. 2 *Maule & Selw.*, 385, *Hagedorn vs. Oliverson.* It is therefore insisted for the appellee:

Augusta Insurance & Banking Co. *vs.* Abbott.

1st. That under the circumstances of this case, the plaintiff, for whose benefit the policy was issued, was only bound to see that the vessel on board of which his cargo was put, was seaworthy, well fitted, manned and equipped, at the inception of the voyage; and that he is not responsible for the acts of the master and mariners of the vessel, in respect to the mode of conducting the voyage. In support of this view, see 2 *Gill*, 370, *Georgia Ins. & Trust Co. vs. Dawson;* 5 *Mees. & Wels.*, 415, *Dixon vs. Sadler*, and same case in 8 *Mees. & Wels.*, 896; 11 *Pet.*, 224, *Waters vs. Merchants Louisville Ins. Co.;* 1 *Kernan*, 9, *Mathews vs. Howard Ins. Co.*

2nd. In Maryland, "underwriters are liable for a loss, the proximate cause of which is one of the enumerated risks, though the remote cause may be traced to the negligence of the masters and mariners," (2 *Gill*, 370,) and this rule applies to all cases involving the negligence of the master and crew, such as taking in sail, steering the course, trimming the ship, selecting the route, in *stopping in port*, in *hastening* or *retarding* the *operations* of the *voyage;* for all these might be remotely connected with the loss. This rule might not apply to a deviation in its broad sense, or a breaking up of the voyage, upon the ground that there is an implied warranty in the policy, that the voyage between the points designated is to be performed; but this implied warranty does not require this to be done with the utmost speed practicable. But this rule does and must apply to a *delay in commencing* the voyage, arising from the negligence or default of the master where the *cargo* is insured, and belongs to a party *not the owner of the vessel*, and when the *owner of the cargo* has used due diligence in shipping it. This is now the received law of this country and of England. See 10 *East*, 415, *Bowden vs. Vaughan*, and 2 *G. & J.*, 160, *Allegre vs. Maryland Ins. Co.*, where the distinction is drawn between the case where the assured owns both *vessel* and *cargo*, and where he owns *only cargo*. No such laches on the part of the master can affect the holder of a *policy on cargo*. The case in 2 *Smedes & Mar.*, 340, is not against us in view of the facts of the present case, and if it is, it is not the law of Maryland, for it is in *direct conflict*

with *Dawson's Case*, in 2 *Gill*, 370, and cannot be regarded as authority by this court.

3rd. There was no stipulation on the part of the assured, that the vessel was to sail by any particular day. The insurers might have inserted such a provision in the policy, or have advised the assured in time before the sailing of the vessel, that they relied upon Fall's statement, that she was "about ready to sail" or "would sail soon," as a representation, neither of which was done, and no advantage can now be taken of this defence. 1 *Camp.*, 119, *Beckwith vs. Sydebotham*. 2 *G. & J.*, 160. 10 *East.*, 415.

4th. But if there was any delay or detention it was *excusable*. It was caused by the proceedings of a court of competent jurisdiction, and without fault or omission by the assured, the owner of the cargo. The insurers take upon themselves by this policy, perils "from restraints and *detainments* of all kings, princes or people, and *barratry* of the master, (unless the insured be the owner of the vessel,) and of mariners." The detention here, arose from liabilities of the vessel to material men. The owner of the cargo was under no obligation to pay these liabilities. It was the duty of the owner and master to pay them. Can their failure affect the assured the owner of the cargo? In this policy the distinction is made between the owner of the vessel and cargo in respect to barratry of the master, and this distinction prevails throughout. In the case of the *Patapsco Ins. Co. vs. Coulter*, 3 *Pet.*, 236, it was decided, that where the policy covers the risk of barratry *and fire be the proximate cause*, the courts will not sustain the defence, that *negligence was the remote cause*. The law cited on the other side, applies only to *voluntary* deviations. Here, for part of the time it was impossible to get a crew, and for the rest of the time the libels detained the vessel. The inability to obtain a crew is by all the authorities sufficient to excuse a delay; for a crew to navigate the vessel is just as necessary to her seaworthiness as the *planks* on her *bottom*. Before this difficulty was removed, she was detained by the libels under which the marshal had power to seize and detain her. But it is said the plaintiff ought to have paid these

claims. This we deny. The plaintiff was a mere *freighter* not *chartering* the vessel and was not bound to pay these port charges. Where a voyage is once *commenced* the master may *sell* or *hypothecate* the cargo, in order to *complete* the voyage, but this law has no application to the case of a ship lying in port before the voyage is commenced; it applies to the case of *completing* a voyage *begun*, not to charges incurred before that time.

5th. The evidence in the case, shows that the detention did not increase the risk and was *immaterial.* The first libel was filed on the 30th of November, at which time the vessel was not ready to sail, and she could not have sailed until December, even if not detained by the libels. The proof shows, that December was more dangerous than November, but this proof applies to the entire month of December. 2 *G. & J.*, 160.

6th. The insurance in this case being "for whom it concerns," and being intended to induce the plaintiff to ship a cargo by the Orb, and having been obtained without any previous authority to do so from the plaintiff, he is not bound by any acts, representations or concealments, if any, on the part of the captain or Fall, and is not responsible therefor to any extent whatever. His subsequent ratification of the policy does not make him responsible for their conduct in effecting it, unless he was in some way apprised or informed of such conduct. In this respect, it differs from an ordinary insurance, which could be effected only by the party insured, or some one acting in his behalf, or by his authority previously given. The defendant, by issuing a policy in this form, has induced an innocent third party without knowledge or notice of the conduct or acts complained of, to accept the insurance and ship his cargo upon the faith of it. 1 *Term Rep.*, 12, *Fitzherbert vs. Mather.* 4 *Mason*, 74, *Ruggles vs. General Interest Co.* 12 *Wheat.*, 414, *General Interest Co. vs. Ruggles.* 5 *Cranch*, 100, *Hodgson vs. Marine Ins. Co.*

7th. There is no evidence that there was any concealment or misrepresentation on the part of Frisbie or Fall, and none is pretended on the part of the plaintiff. Banks says, that Fall represented that the vessel was then at Baltimore, that

47    v. 12.

she was about ready to sail from there bound to Boston. Fall states, he represented that the brig Orb was then at Baltimore, and that she would sail therefrom soon, on the voyage insured, but no particular time was stated when she would sail. On this point see 1 *Camp.*, 119; 2 *G. & J.*, 159. Again, Fall made a representation as to the seaworthy condition of the vessel, and being asked what was the condition of the vessel, he represented that she was a good old vessel. When this representation was made, the agent referred to the Boston marine inspector's report, which showed the age of the vessel and her rate as B. 1. Fall also represented, that on the voyage before she brought a freight of *coal* from Philadelphia to Charleston, and that the cargo was not insured, that the man whom she brought the coal for never had his cargoes insured *as he understood*. Fall says he made no untrue statement, and none which was designed to deceive or mislead the underwriters; that he had no interest and no object except to accommodate Frisbie and assist him in getting business. There was no misrepresentation, either as respects the time of sailing nor as to the actual condition of the vessel. The jury have found that the vessel at the commencement of the voyage was seaworthy, that she was sufficiently tight, staunch and strong, for the voyage insured with the cargo insured, and that she was properly officered, manned and equipped therefor, and they have therefore found the truth of every representation made as to the condition of the vessel, and there is no proof that any statement was made which was *not true*. Was there any *concealment* as respects Fall? It is contended, that he ought to have shown the letter from Frisbie to him, of the 20th of October. This letter showed nothing beyond the fact, that Frisbie could not get *insurance in Baltimore*, and desired Fall to get it in Boston. Now it is well settled law, that the assured is not bound to state to the underwriters, that he has applied to others who refused to insure. 4 *Mason*, 83, *Ruggles vs. General Interest Co.* Fall states that he had no conversation and no communication with Frisbie, in relation to any prior application for insurance, and that he was not able to state in what condition of repair the vessel was in when at

Baltimore in the fall of 1852, or whether she was seaworthy, but from what he had heard of her, he should say she was fit to carry a cargo of lumber from Baltimore to Boston, at that time. So far then as respects Fall, there was no concealment; he replied fully, frankly and truthfully, to the question put to him. He was not asked as to whether there had been any previous application to insure, and was not bound to refer to this as no such matter was inquired about. As respects Frisbie, it is proved by the two witnesses at Boston, that he was not present when these representations were made, and his own testimony, although differing as to the fact of his being present at some time, yet it confirms what the others say so far as these representations were made, and that if made at all, they were not made in his hearing. But it is said Frisbie knew all the circumstances which had taken place at Baltimore, and was bound to communicate them to his agent Fall, so that the latter might have made them known at the time he applied for insurance. On this subject, the case of *Haywood vs. Rodgers*, 4 *East.*, 590, is directly in point. In that case the principle is laid down, "as an assured impliedly warrants the ship insured to be seaworthy, what forms an ingredient in seaworthiness is not necessary to be disclosed by the assured in the first instance, unless information on the subject be particularly called for, and then the assured must disclose truly what he knows in the respect required." See also 3 *Kent*, 286. The only inquiry here made was *general* in its character, no particulars are specified. Again, a party making a concealment or misrepresentation, must know that what he states is *false*. When Fall said she was a *good old vessel*, he said what he believed was true and what the jury have found to be true. To constitute concealment *facts* must be kept back not *opinions*. There is no evidence that the plaintiff or Frisbie, knew that the Baltimore Marine Insurance Reports had discredited the vessel by rating her B. But suppose they did, the defendant's agents took the risk upon the Boston report, not on what Fall told him.

8th. All the prayers of the defendant, except the first and second are fatally defective in form, and for this reason ought

not to have been granted.    They all contain this clause, "and
if the jury shall find all the *other facts assumed in this prayer.*"
This is a fatal defect, for if any facts *are assumed* the prayer
is bad, and if there are none assumed the clause tends to *mis-
lead* the jury.

9th.  The ruling of the court in the second exception was
correct, for under the rules and practice of that court, the
counsel had no right to offer the prayer at that stage of the
case.    Besides, the law of it was erroneous, if the positions we
have already argued are sound.

10th.  The court below was right in refusing to permit coun-
sel in the argument of facts before the jury, to read the opin-
ion of judges from *law books*, on a point of law which the
court had decided by its action on the prayers presented in the
case.    If this were permitted, there would be no means of re-
viewing in the court above the legal propositions insisted on,
and the right of appeal would thus be virtually destroyed.

BARTOL, J., delivered the opinion of this court.

This action was instituted by the appellee, on a policy of
insurance made by the appellant, upon a cargo of lumber per
brig Orb, at and from Baltimore to Boston.    The policy was
issued in the name of "*Parker Fall, for whom it concerns;*"
and the first question presented for our consideration is, whether
the appellee has such an interest in the policy as to give him a
right of action upon it?   The evidence shows that the brig was
lying at the port of Baltimore, and that Frisbie, the captain
and part owner, employed Parker Fall, as his agent at Boston,
to obtain insurance on a cargo of lumber, in order to enable
him to procure freight for the vessel; that the appellee had told
Frisbie he would freight the brig with lumber if an insurance
could be obtained upon it, but did not expressly authorize
either Frisbie or Fall to obtain the policy in question, nor had
he any knowledge of it until after it was issued, when he
adopted it, and, upon the faith of it, placed his cargo on
board.

The assignment of the policy by Frisbie to Abbott, made
on the 18th day of November 1852, not being made "*with the*

*previous consent in writing of the insurers,"* as required by its terms, conferred no right upon the assignee, and his interest in the contract must be determined as if that assignment had not been made.

The law is well settled, that a policy of insurance is not a negotiable security. The Court of Appeals have said, that "A policy in the name of one, with the general clause *for whom it may concern,* will cover and protect the interest of any person for whose benefit it was intended, and who authorized it to be effected; and if, in the absence of any express order or authority from the owner, or any previous communication with him on the subject, such policy is effected in his behalf, the intention at the time of the party effecting it to cover his particular interest, will so connect him with the policy as that his adoption of it afterwards, will cause it to inure to his benefit. The subsequent adoption of a policy by a party interested, and for whose benefit it was intended, being deemed equivalent to his prior order for insurance. But no one can, by subsequent adoption, avail himself of such a policy who was not at the time in the contemplation of the party procuring the insurance, and for whose benefit it was not intended, notwithstanding any interest he may have in the thing insured." *Newson's Admr. vs. Douglass,* 7 *H. & J.,* 451, 452.

In this case it is contended, on the part of the appellant, that the policy on which the action was brought, was not intended to cover the particular cargo of Abbott; but that it was procured at the instance of Captain Frisbie, for the purpose of enabling him to obtain freight, and was designed to cover any cargo of lumber which he might obtain for the vessel, no matter from whom. If that be so, then upon the authority cited, the appellee cannot maintain his action upon it.

But it is properly a question for the jury to determine, from the evidence, whether the policy in question was or was not designed, *when obtained,* to cover the particular cargo of the appellee, and the Superior Court erred in taking that question from the jury. The second prayer of the plaintiff, which was granted by the court, treated the policy as if it had been issued to Abbott himself, or in his own name.

The next question presented by the record, is whether, in obtaining the policy, there was misrepresentation or concealment of material facts connected with the condition of the vessel? This depends upon the particular facts and circumstances which attended the obtaining of the policy; but before proceeding to an examination of them, it is proper to say that we do not concur in the view taken by the appellee's counsel in the argument, "that a difference exists between such a case as this and the case where a party desiring insurance applies for it by himself or his agent." So far as the question of good faith in obtaining the insurance is concerned, the case where the policy is issued "*for whom it may concern,*" stands upon the same ground as if the name of the assured were inserted. "Every such policy supposes an agency;" (7 *H. & J.,* 450;) no one can avail himself of it, but he for whom it is intended, and although obtained without his knowledge, and without any previous authority to the agent, its adoption by him afterwards, binds him to the acts and representations of the parties or agents connected with the business of procuring it, to the same extent as if they had acted under his authority previously given. See *Park on Insurance,* 208.

In this case, therefore, the appellee is responsible for the acts of both Frisbie and Fall, in their dealings with the company, and if any misrepresentation or concealment of facts material to the risk, be shown on the part of either of them, the policy would be void, no matter how innocent the appellee might be in the transaction; and no matter whether such misrepresentation or concealment be fraudulent, or result from negligence or inadvertence on the part of the agents connected with the business of procuring the insurance. 12 *Wheaton,* 412. 4 *Mason's Rep.,* 74. 1 *Term,* 12. 3 *Kent,* 286.

This results from the nature of the contract: "The utmost good faith and fair dealing are of its very essence, and every fact and circumstance which can possibly influence the mind of any prudent and intelligent insurer, in determining whether he will underwrite the policy at all, or at what premium he will underwrite it, ought to be communicated to him." 2 *G. & J.,* 162.

In this case, the representations of Parker Fall to the agent of the appellant, were made in answer to the question, *"Where is the Orb, and what is her condition as to seaworthiness?"* The reply was, *"She is at Baltimore, about ready to sail, (or she will sail soon.) She is a good old vessel; on the voyage before, she brought a freight of coal from Philadelphia to Charlestown, and the cargo was not insured; that the man for whom she brought the coal, never had his cargoes insured, as I understood."*

The policy was dated the 28th day of October 1852; the vessel did not sail till the 22nd day of December 1852.

The objection of the appellant, that the statement made as to the time of sailing, was a promissory representation which bound the assured, and that the breach of it vitiates the policy, is conclusively answered by the decision of the Court of Appeals, in the case of *Allegre's Admr. vs. The Maryland Ins. Co., 2 G. & J.*, 159, and was abandoned by the counsel in the argument. The time of sailing is not, therefore, material in the consideration of this branch of the case. As to the statement that she was *"a good old vessel,"* according to our construction of those words, they import no more than that she was seaworthy, a fact the truth of which it was proper to submit to the jury upon all the evidence; but that is embraced in the implied warranty, and does not stand upon representation, which is always matter outside of the policy.

It has been argued that the statement made by Fall, *"that the Orb had carried a cargo of coal on her previous voyage from Philadelphia to Charlestown for a man who did not insure,"* &c., was equivalent to a representation that she was then capable of transporting such a cargo, and that there was evidence tending to show the same was not true. In support of this construction the counsel cited 1 *Phillips on Insurance, sec.* 567, where the principle is stated, *"that a representation imports not only what is expressed, but also all the natural and obvious inferences from it."* Without impugning the principle, it is sufficient to say, we do not consider that it sustains the view contended for here. It is not pretended the particular fact stated was untrue; besides, the statement was

made merely on information, and in such case the assured "is not answerable for the truth of the facts stated, but only for the truth with which he has stated the information received." 1 *Arnould, sec.* 193.

Nor did that statement, in our opinion, operate to change the contract. The policy issued was on a cargo of lumber; the implied warranty was that the Orb was seaworthy for the transportation of such a cargo, and the statement made to the agent of the underwriter did not enlarge that warranty so as to require the assured to prove that the brig was seaworthy for the transportation of coal at the time of the contract. The difference between a representation and a warranty, is, that while the latter must be literally fulfilled, it is sufficient if the former be substantially complied with. In the language of Lord Mansfield, in 1 *Term Rep.*, 345, "A representation may be equitably and substantially answered; but a warranty must be strictly complied with."

Having disposed of the question of *allegatio falsi*, we have next to consider whether there was *suppressio veri* in obtaining the policy? It is undoubtedly true that a concealment of facts material to the risk, which the assured is bound to communicate, stands upon the same ground and has the same effect as a statement of material facts which are untrue, and will avoid the policy, whether such concealment be through design or from inadvertence. This brings us to the inquiry, what facts is the assured bound to communicate?

In this case the alleged concealment has reference entirely to matters touching the seaworthiness of the vessel, or going to show that the risk had been declined by others. The authorities all agree, that "if the subject on which disclosures would otherwise be requisite, be covered by a warranty either express or implied, in that case it need not be matter of representation." (3 *Kent*, 286.) "And as in every contract of insurance there is an implied warranty of seaworthiness, the assured need not, in the first instance, disclose any fact, however material to the risk, which tends to show that the ship was unseaworthy when she sailed." *Haywood vs. Rodgers,* 4 *East*, 597. 1 *Arnould*, 56.

It is true this rule is changed when inquiries are made as to matters embraced in an implied warranty. Such inquiries may render it necessary for the insured, or his agent, to disclose facts respecting which he might otherwise be silent. See 1 *Phillips, sec.* 601. 1 *Arnould,* 518. And it has been argued that the inquiry addressed to Fall, in this case, "What is the condition of the Orb as to seaworthiness?" imposed upon him the obligation of disclosing—

1st. The contents of Frisbie's letter of the 20th of October.

2nd. The facts and circumstances which had occurred in the port of Baltimore, tending to show the insufficiency of the brig to carry coal.

3rd. The fact that the marine reports in Baltimore had discredited her as unseaworthy.

It is clear that there was no obligation upon the assured, or his agents, to disclose any of these things, unless particularly interrogated with regard to them. The insurer had an undoubted right to ask for information upon such matters, and if he had done so, the assured would be bound to make true answers to such inquiries; but in this case no such inquiry was made. The question was general and indefinite, not pointing to any particular fact; it imported no more than an inquiry as to whether the Orb was seaworthy, and imposed no more obligation upon the assured to disclose the matters alleged to have been concealed, than if no question had been asked. The rule is well settled, that the assured is not bound to disclose the fact that the risk has been declined by others, or the estimate they put upon it, unless information on the subject be particularly called for. See *Ruggles vs. The General Interest Co.,* 4 *Mason,* 83. 3 *Kent,* 286.

Upon these grounds we are of opinion, that even if the facts and circumstances to which we have referred were all proved, the agents of the assured were not bound to disclose them, and consequently the omission to do so, would not impair the policy. But the letter of Frisbie, and the other facts and circumstances detailed in the evidence, relating to the condition of the Orb, were all proper to be submitted to the jury,

and considered by them, in deciding the question of the sea-worthiness of the vessel.

The remaining question to be considered, is, whether the underwriters have been discharged by a *deviation?* The proof in the cause is, that the cargo was laden on board by the 19th of November, and that the vessel did not sail till the 22nd of December, and it is contended that this delay in the sailing of the vessel amounted to a *deviation,* which discharges the insurer.

This being a policy on *a voyage at and from Baltimore to Boston,* the risk commenced from the time the lumber was laden on board, and a deviation thereafter will avoid the policy, whether it occurred before or after the vessel actually left the port of departure.

The law on this subject is well stated by *Arnould, Vol.* 1, *page* 383, *sec.* 146. He says: "As the sole ground upon which a deviation discharges the underwriter, is, that it *varies* the risk, and as it is evident that the risk may be as much varied by a delay in commencing or prosecuting the voyage, as by a divergence from its prescribed course, it follows that every such delay, if *unreasonable* or *inexcused,* will discharge the underwriter." This principle is sustained by the authorities there cited, and recognized in every elementary treatise on insurance.

In this case it is contended, that the insurance being on the *cargo,* and not on the vessel, and the appellee not being the owner of the brig, and having no control over her, is not responsible, even though the delay amounted to a deviation; and in support of this view the cases in 5 *Mees. & Wells.,* 415, 8 *Mees. & Wells.,* 896, and 2 *Gill,* 365, have been cited. But those cases did not involve the question of a deviation; they turned upon the familiar principle *causa proxima non remota spectatur,* and affirm the rule, that when the immediate cause of the loss is one of the perils insured against, the underwriter is bound, although a remote cause may be *negligence* or *unskilfulness* on the part of the captain and crew engaged in navigating the vessel. The cases in 3 *Peters,* 222, and in 11 *Peters,* 224, are to the same effect.

Augusta Insurance & Banking Co. *vs.* Abbott.

The law of deviation stands upon entirely different ground. The inquiry is not whether the loss resulted in any manner from the deviation. *Park on Ins.*, 294. The reason why it is held to avoid the policy, is because it changes the risk, and substitutes a different voyage for the one insured against.

It is as much an implied warranty in every insurance on a voyage, that the ship shall not deviate, as it is that the ship is seaworthy; and each of these warranties is implied, whether the insurance be on the ship or on the cargo. After a careful examination of the numerous authorities cited in the argument, and many others, we have been unable to find any one sustaining the distinction so much insisted on at the bar, between the assured on the vessel and on the cargo, where the question of avoiding a policy by deviation has been involved, although in many of the cases such a distinction, if it existed, might have been properly recognized.

The same observation was made by the learned judge who delivered the opinion of the High Court of Errors and Appeals of Mississippi, in the case of *The Natchez Ins. Co. vs. Stanton Buckner & Co.*, 2 *Sm. & Mar. Rep.*, 340. In that case this question was elaborately considered and decided. An attempt has been made to impugn that decision on the ground that, in some respects, the law of implied warranty therein announced, is contrary to the ruling of the Court of Appeals of this State, in the case in 2 *Gill*, 365. Upon an examination of the cases, however, it will be found that so far as the principle we are now considering is concerned, the cases are not in conflict; and we think the law on this point is clearly and properly laid down in the case of *The Natchez Ins. Co. vs. Stanton Buckner & Co.*, and sustained by the whole current of authorities applicable to the subject.

We have no hesitation in saying, that the delay which occurred in the sailing of the Orb, would amount to a deviation which would discharge the underwriters, unless it proceeded from causes which justify or excuse it. 8 *Bing.*, 317. What the actual causes of the delay were, is a question of fact for the jury. The legal sufficiency of such causes to justify or excuse it, must be decided by the court. 7 *H. & J.*, 291.

If, as the appellants insist, the delay was occasioned by the proceedings instituted in the Admiralty Court of Baltimore, for the recovery of debts due for repairs and supplies done and furnished to the vessel, then the delay was not legally justified; or, in other words, the risk of such detention is on the assured, not on the underwriter.

It is laid down in *La Guidon de la Mer*, "that the under-writer does not run the risk of obstructions occasioned by the debts, insufficient acquittance, or neglect to pay debts of the assured." See 1 *Phillips*, 590. 3 *Kent*, 378. And upon a careful consideration of the question, we are of opinion that this rule applies, whether the policy be on the vessel or on the cargo. This follows from the principles regulating the extent of the risk assumed by the insurer, and inasmuch as the vessel and owners are responsible to the shipper, under the contract of affreightment, for any loss which he may suffer from such delay, it is not reasonable to hold the underwriter bound, without some stipulation in the contract to that effect. It is not covered by the terms in the policy, "restraints and detainments of all kings, princes, or people;" for the construction of those words, see *Park on Ins.,* 78, 79, 80, 81.

On the other hand, if the delay resulted from the difficulty of obtaining a crew, and there is evidence in the record to go to the jury tending to prove that fact, then the delay would be excusable, and the underwriters remain answerable. 1 *Akyns*, 545, *Motteux vs. London Assur. Co.*

Having thus determined the principles which, in our opinion, govern the decision of this case, we shall proceed, in a few words, to dispose of the several prayers presented in the cause, and found in the several bills of exceptions.

The first bill of exceptions contains two prayers on the part of the plaintiff below, and seven on the part of the defendant. The court granted both those of the plaintiff, and rejected all of those offered by the defendant, except the first.

The first prayer on the part of the plaintiff and of the de-fendant, respectively, were granted without exception, and are not before us for review on this appeal.

The second prayer of the plaintiff ought not to have been

granted. This follows from what has already been said in the opinion of this court, and it is unnecessary to repeat here the several particulars in which it is erroneous. It withdrew from the jury the consideration of several facts upon the decision of which, in our opinion, the right of the plaintiff to recover depends; and the judgment must therefore be reversed.

The second prayer of the defendant ought to have been granted, the proposition of law therein contained is correct.

With reference to the phraseology of all the other prayers of the defendant, both in the first and second bills of exceptions, we consider it proper to remark, that, in one respect, they are all objectionable. Each of them, after stating certain facts hypothetically as the basis of the legal proposition, contains the words, and if the jury shall find *"all other facts assumed by this prayer."* Such a clause is unusual in practice, and, we think, objectionable, as tending to mislead the jury. If there are any facts assumed, the prayer would be erroneous; if there are none, then, in any view of them, the words are unnecessary. We are aware of the reason which led the counsel to insert the words, but think they do not accomplish the object designed; and as this is the first time this court has had its attention called to prayers in that form, we deem it proper to say, that in our opinion such a clause forms a substantial objection, and would vitiate a prayer, although in other respects unexceptionable. Prayers in this form were before the court in the case of *Hopkins vs. Boyd*, 11 *Md. Rep.*, 107, but no point was made upon their particular phraseology, and it would have had no effect upon the judgment of the court in that case.

The facts upon which the court's instruction is asked, ought to be stated in the prayer, otherwise the legal proposition is vague and indefinite, and the jury ought not to be left to speculate and conjecture what facts are assumed by the prayer, and yet are necessary to be found by them, as the ground of their verdict.

Looking at the defendant's prayers as if the objectionable clause to which we have referred were stricken out, we are of opinion, for the reasons already given in stating the general

principles governing the case, that the 5th 6th and 8th prayers of the defendant were properly refused. They are based upon the defence set up on the ground of misrepresentation and concealment.

The defendant's fourth prayer was properly rejected, because it treats the statement made by Parker Fall, "that the brig would sail soon," as a promissory representation binding upon the assured, which we have said is not its legal effect, or if that be not the true construction of the prayer, it is faulty, because it refers in general terms to the causes of delay "*as given in evidence,*" instead of being limited to those which we have said were not sufficient in law to excuse it. There are causes of delay mentioned in the evidence to which we have before referred, which, in the opinion of the court, would justify and excuse it, provided the jury should find they were the actual causes which detained the vessel, to wit, the difficulty of procuring hands at that time in Baltimore.

The defendant's 3rd and 7th prayers (without the objectionable clause spoken of) should be granted; they are in conformity with the principles which have been stated on the question of deviation. But in the expression of this opinion, we are not to be understood as deciding that the captain of the brig had the power of selling or hypothecating the cargo, or any part of it, for the purpose of paying the debts of the vessel previously existing and contracted without reference to the particular voyage, and unconnected therewith. Such sale or hypothecation, under the circumstances of this case, could only have been made by the master, with the consent and authority of the appellee, who was on the spot, and whom it was the duty of the captain to consult. See *Abbott on Shipping*, 243. But whether such efforts to sell or hypothecate the cargo were made or not, it is sufficient to say, that in the opinion of this court the detention of the vessel by the causes referred to in these prayers, if the jury should find they were the causes of her delay, was a risk of the assured, and not one assumed by the underwriters under the contract.

The second bill of exceptions is taken from the refusal of the court below to grant the defendant's 8th prayer, and we

have already said that such ruling was correct, for one of the reasons assigned by that court, to wit, "because it was not the law of the case;" and we deem it unnecessary to express any further opinion thereon.

With reference to the question presented by the third bill of exceptions, we deem it sufficient to say, that in conducting trials at *nisi prius*, many things necessarily depend upon the discretion of the court, and we think the ruling of the Superior Court, to which this exception was taken, was on a matter within its discretion, and that no appeal lies therefrom.

*Judgment reversed and procedendo awarded.*

(Decided July 22nd, 1858.)